UNION NATIONAL BANK OF CHICAGO, Appellant, v. MEAD MERCANTILE COMPANY.

Division Two, June 26, 1899.

1. **Attachment:** DEALING IN FUTURES: FRAUDULENT CONVEYANCES. The venturing of money and credit in speculations, by buying and selling wheat for future delivery, where the grain is bought and sold, is not such a fraudulent conveyance of property as will justify an attachment, there being no element of covering up or secreting the property for the use of the speculator.

2. ———: INSERTION OF FICTITIOUS NOTE IN DEED OF TRUST BY MISTAKE. Where the assignee of a bank found a fictitious or accommodation note among the assets, and supposing it to be genuine, had his attorney include it in a deed of trust given by the maker to secure it and other large notes, and the amount of the genuine indebtedness thus secured far exceeded the value of the property conveyed, there has been no such fraudulent conveyance of property, or an attempt to cover up the grantor's property, as will justify an attachment.

3. ————:ATTORNEY'S FEES: TO BE PAID BY ASSIGNEE. Where a mercantile company conveys all its property to the assignee of a bank, to secure its indebtedness to the bank, it is not improper or bad faith to provide therein that the assignee shall pay for the services of attorneys in defending any attachment suits that might thereafter be begun against the property.

*Appeal from Saline Circuit Court.*—HON. RICHARD FIELD, Judge.

AFFIRMED.

LESLIE OREAR and ALF. F. RECTOR for appellant.

(1)   The plaintiff's evidence showed that for a long time prior to the suing out of the writ of attachment, the defendant company was engaged in the business of dealing in options and grain futures, employing the capital and assets of the defendant company in that business instead of in the business authorized by its charter.   The charter of the defendant company did not authorize it to deal in options or employ any part of its capital or assets in that business.   Such a business, conducted by a corporation, is an unlawful disposition of its assets such as will maintain a suit by attachment against the corporation, and on this proof alone the plaintiff was entitled to have the issue submitted to the jury on proper instructions.   R. S. 1889, secs. 3931 and 3932; Hall v. Hart, 71 N. W. Rep. 1009.   (2)   Before the levy of the attachment the defendant company had issued a fictitious warehouse receipt covering all of the wheat stored in the defendant company's elevator at Slater and which the manager was endeavoring to locate and to give security to the holder to secure the amount of indebtedness represented by such warehouse receipt.   And being a fictitious debt it not only authorized the jury to find a verdict for the plaintiff if such proof should not be controverted, but would justify a peremptory instruction in behalf of the plaintiff.   State ex

rel. v. Hope, 102 Mo. 410; Boland v. Ross, 120 Mo. 208.
(3)   It was also shown by the evidence that the note for
$2,500, described in the deed of trust read in evidence, was a
fictitious debt, and that it was intentionally included in the
said deed of trust and was attempted to be secured by it.
(4)   The provision in the deed of trust, whereby the trustee
was authorized and directed after making a sale of the prop-
erty, to use the proceeds in paying the attorneys' fees for liti-
gating the title to the property, was, in the light of the testi-
mony of Storts, a fraudulent arrangement, and had the effect
of postponing not only the unsecured but the secured creditors
as well.    Wait on Fraud. Convey., sec. 335; Shellebarger v.
Mottin, 47 Kan. 451; Bank v. Croco, 46 Kan. 621; Nichols
v. McEwan, 17 N. Y. 22; Hill v. Agnew, 12 Fed. Rep. 230;
Lehman v. Bently, 18 N. Y. Sup. 778; Hancock v. Durand,
42 Ill. 231; Crane v. Gould, 46 Ill. 294; Brainerd v. Dunning,
30 N. Y. 211; Planck v. Schermerhorn, 3 Barb. Ch. 644;
Matthews v. Loth, 45 Mo. App. 455; Simon v. Norton, 56
Mo. App. 338.

JOHN A. RICH and D. D. DUGGINS for respondent.

There are about two points in this case.    (1)    Whether
any of the debts secured were fraudulent; that is to say,
whether any part of the debt was taken by the assignee with
a fraudulent intent to hinder or delay the creditors of the de-
fendant Mead Mercantile Company.    The assignee found the
evidence of indebtedness among the assets of the bank, and he
had no personal knowledge of any of them; he supposed (as
he had a right to do) that the debts were all valid and genuine,
and even if one of the debts should be found to be without
consideration, yet this is not sufficient reason to invalidate the
deed of trust.    Boland v. Ross, 120 Mo. 217; Cole v. Yancey,
62 Mo. 239; Bank v. Winn, 132 Mo. 288; Wait on Fraud.
Conveys. (2 Ed.), sec. 228; Hawkins v. Alston, 4 Irev. Eq.
(N. C.) 145; Pinneo v. Hart, 30 Mo. 569.    (2)    The

provision in the deed of trust authorizing the trustee to pay "attorneys' fees and costs, if any, in litigating title," under the circumstances does not have the effect to render the deed of trust fraudulent and void in law. Pinneo v. Hart, 30 Mo. 569. If the clause in the deed of trust above referred to had been omitted from the deed of trust the result would have been the same. The assignee would have been compelled to defend the attachment suit with his own attorneys. 2 Jones on Mort. (3 Ed.), sec. 1923.

GANTT, P. J.—This is an action by attachment upon an unmatured note executed by the Mead Mercantile Company to the order of Joseph Field for $14,000, dated October 2d, 1894, and due six months after date with interest from maturity. The payee transferred the note to the plaintiff bank before maturity. The action was commenced December 20th, 1894. The grounds of attachment were that the affiant had good reason to believe and did believe that the defendant was about to fraudulently convey or assign its property and effects so as to hinder or delay its creditors; that it had fraudulently conveyed and assigned its effects so as to hinder and delay its creditors; that the defendant was about to fraudulently convey or dispose of its effects so as to hinder and delay its creditors. The defendant filed its plea in abatement at the February term, 1895, duly verified, denying each and all the allegations in the affidavit.

The evidence was meagre.

R. C. Lake, the second vice-president of the plaintiff bank, testified he lived in Chicago; that he knew Joseph Field, the cashier of the Citizens Stock Bank, in his lifetime; that his bank became the owner of the $14,000 note sued on sometime in the month of October, 1894, as collateral for a loan to the Citizens Stock Bank. Upon the failure of the latter bank he came to Slater, Missouri, to get said note secured. He called upon C. W. Mead, one of the stockholders of the

Mead Mercantile Company, and Mead told him he could not secure him. He asked him to secure him on the real estate but he refused. He says Mead asked him if the plaintiff bank had in its possession a warehouse receipt for wheat. Witness expressed surprise that the company should have issued a receipt when it had no wheat, but Mead said it had been given out by some members of the corporation to the Citizens' Stock Bank, and was fictitious, and he was anxious to find it in order to secure it, and declined to secure witness.

Mr. McCune testified that the Mead Mercantile Company turned over collateral to him to secure the Union National Bank of Kansas City, and in the course of conversation inquired if that bank held such a warehouse receipt; that some one in charge of their elevator had issued such a receipt when there was not in fact sufficient grain to cover the receipt and he was anxious to find it and secure it.

As a matter of fact there was no evidence that such a receipt was then in existence and it was never secured, by a mortgage or otherwise, by the Mead Mercantile Company.

John E. Bridges testified that the Mead Mercantile Company bought and sold grain in Chicago in the name of John E. Bridges & Co. The company had on hand on May 1st, 1894, 8,000 bushels of wheat. They bought 50,000 bushels at Slater. That 58,000 bushels was shipped to different houses in Chicago, Rosenbaum Bros., J. A. Edwards & Co., Montague & Co., and J. M. Brown & Co., and 5,700 bushels of it to J. N. Booth, St. Louis. It sold for 58 cents per bushel. They bought some wheat for future delivery. He thought that on options and futures the company lost perhaps a thousand or two dollars, not much considering the amount of their deals. On the 19th of December, 1894, the Mead Mercantile Company had a meeting; all of the directors were present. The Citizens Stock Bank had failed on December 17th, and the board on the 19th authorized the execution of a deed of trust to secure two notes held by the assignee of the Citizens

Stock Bank, which had been executed by the Mead Mercantile Company, one for $10,000, the other for $2,500.   He testified he knew the $2,500 was outstanding on the 17th of December, 1894.   He could not say what it was given for.   If it was an accommodation note he didn't know it.   He didn't know what the Citizens Bank gave for it.   In pursuance of the authority given the Mead Mercantile Company by its president, L. S. Mead on the 24th day of January, 1895, conveyed by its deed of trust of that date to James A. Robertson, as trustee and Commodore Storts, assignee of the Citizens Stock Bank, as *cestui que trust*, all of its real estate (specifically described) in trust for the following purposes:

"Whereas, Mead Mercantile Company is indebted to said assignee for overdraft on said bank for seven thousand, eight hundred and twenty-six and 47-100 dollars.   Also a promissory note dated September 1st, 1891, payable in 60 days to Joseph Field, cashier, for ten thousand dollars; also a note dated April 27th, 1894, for twenty-five hundred dollars due four months, each with interest from maturity at the rate of eight per cent per annum.

"Now if said notes and overdraft to be paid within nine months, then this deed shall be void and the property hereinbefore conveyed shall be released at the cost of the said party of the first part;  but if default be made in the payment of said notes and overdraft within nine  months. aforesaid, then this deed shall remain in force and said party of the second part, or in case of his death, refusal to act or absence from said State when authorized to sell under these presents, and a sale be desired by the holder of said notes or overdraft, then the sheriff of Saline county, for the time being, who shall thereupon become his successor to the title of said property and the same become vested in him, in trust, for the purposes and objects of these presents, and with all the powers, duties and obligations thereof, may proceed to sell the property hereinbefore described, or any part thereof, at public vendue, to the

highest bidder at the postoffice door in the city of Slater in the county of Saline and State of Missouri, for cash, first giving twenty days public notice of the time, terms and place of sale and of the property to be sold by advertisement in some newspaper published in the county of Saline, State of Missouri, and upon such sale, shall execute and deliver a deed in fee simple of the property sold to the purchaser or purchasers thereof (a recital wherein of the giving of such notice and in case such sheriff as aforesaid sell, of the happening of any of either of the aforesaid events, making him successor herein as aforesaid, shall be proof thereof) and receive the proceeds of such sale, out of which he shall pay first the cost and expenses of this trust, including compensation to the trustee for his services, insurance, all taxes and attorney's fees and costs if any in litigating title, and next whatever may be in arrears and unpaid on the notes and overdraft aforesaid, whether of principal or interest, and the remainder, if any, shall be paid to the said party of the first part or its legal assigns, and the said party of the second part covenants faithfully to perform and fulfill the trust herein created."

After that deed of trust was given the company did no more business. The company is insolvent and was when it made this deed of trust. The company did not employ any lawyers to defend this case. The assignee's regular attorneys represented him in defending the suit for the assignee.

The assignee, Mr. Commodore Storts, testified that he had been a clerk for nine years for the Citizens Stock Bank, which made an assignment on the 17th of December, 1894. He was made assignee and took charge of everything belonging to the bank, including its books, showing the Mead Mercantile Company's account for 1893 and 1894. On the 17th day of December, 1894, there was no draft for $1,600 passed to the credit of said Mead Mercantile Company, nor for that amount at any time between the first and 16th of December, 1894; there were two amounts which added together would

make $1,600, between those dates, to wit, December 8th, $400, and December 17th, $1,200. He testified further that when he took charge of the bank he found among its assets the $2,500 note and the $10,000 note for which the Mead Mercantile Company gave him the deed of trust assailed by the plaintiff in this attachment.

The books of the bank do not show what the bank gave for the $2,500. They show no discount of said note. They do show that the $10,000 note was discounted and passed to the Mead Mercantile Company's credit. He was not present at the company's meeting when it directed the deed of trust to be executed. He had learned they were to secure these two notes and the overdraft.

He was asked who employed the attorneys in this case and replied, "When they agreed to give me this deed of trust they told me attachments had been filed against them; that their business was straight, and they would expect my attorneys to defend the suit. I never employed any counsel in this particular case. Mr. Davis and Mr. Rich were my regular attorneys in the assignment, and I had Mr. Williams retained if I needed him. They did not tell me that I was to pay the attorneys out of this property. I saw the deed of trust and submitted it to Mr. Rich and accepted it. I put this $2,500 note in the deed of trust because it came into my hands as assets and I thought it was my duty to collect it. I had placed it in the hands of my attorneys before the deed of trust was given. I did not know at that time this suit had been filed. I know the property described in the deed of trust. It is reasonably worth $3,300 all together."

On this evidence the court sustained a demurrer to the evidence and this raises the issue on this appeal.

I. The plaintiff advances the novel proposition that this attachment, obtained on the ground that defendant was about to fraudulently convey its property and effects so as to hinder and delay its creditors, and has fraudulently conveyed and

assigned its effects so as to hinder and delay its creditors and is about to fraudulently convey and dispose of its effects, should have been sustained by the proof that the defendant, the Mead Mercantile Company, while yet a going concern bought and sold grain for future delivery, but the witness called by plaintiff distinctly testified that there was no agreement that if there was a rise in the market the company had the option to close up the deal and settle the difference, but on the contrary that the wheat was bought and sold. The venturing of its money and credit in speculations of this kind may be reprehensible, but this evidence falls far short of proving a fraudulent conveyance of property. There is not an element of covering up or secreting the property for the use of the Mead Mercantile Company.

The most that can be said of it is that it was, so far at least as the proof goes, an investment of a portion of its funds with the hope or expectation of receiving a profit. It was neither a voluntary nor fraudulent conveyance as those terms are used in the statute.

The case cited from Nebraska [Hall v. Hart, 52 Neb. 4], does not sustain the claim here made. In that case a party who had bought a saloon and had an agreement with his vendor that he could continue to run it in the grantor's name and thus avoid the license, was held to be estopped to deny it was the vendor's property when it was subsequently levied on for the vendor's debt. The distinction is too obvious for discussion.

II. It is further urged that the court erred in sustaining the demurrer to the evidence, because the evidence tended to prove that the $2,500 note included in the deed of trust was fictitious and not in fact an obligation of the company.

There is not a word to show that the assignee Storts knew or had reason to believe the $2,500 was not a valid evidence of debt. He found it among the assets of the bank. He placed it in the hands of his attorneys for collection and when finally

the company concluded to give him the deed of trust he sent
to Marshall for it.   As he says, he had it put in the deed of
trust because he thought it was his duty to collect it.   If there
was any fraudulent purpose on the part of the Mead Mercan-
tile Company to defraud, it is clear there is no evidence that
Storts participated in such purpose.   Outside of the fact that
the bank books did not show the consideration given for this
note and that Bridges says it was not given by express au-
thority of the board of directors, there is nothing to impeach
the consideration of the note, but granting that there was no
consideration for the note, as the assignee had it inserted be-
cause he believed it was genuine and valid and Bridges says
if it was accommodation paper he didn't know it, it would be a
harsh ruling to declare the deed of trust void *in toto*.   Even
if upon a full investigation it should be shown that the $2,500
was without consideration, yet under all the circumstances
herein detailed this fact alone would not render the deed of
trust fraudulent and void, but it would be a valid security for
the $10,000 note and the overdraft which are unimpeached.
The insertion of the $2,500 note was under a mistake of fact,
which we have held will not vitiate the whole security and
thus takes it out of the rule in State ex rel. v. Hope, 102
Mo. 410.

The meagerness of the mortgaged property compared to
the amount of the admitted indebtedness forbids any suspi-
cion that either party invested this $2,500 in the deed of trust
fraudulently or to cover it up for the Mead Mercantile Com-
pany.   The property was valued at $3,300 and, excluding the
$2,500 note, the remaining indebtedness was nearly $18,000
on its face exclusive of interest.   [Boland v. Ross, 120 Mo.
loc. cit. 217; Bank v. Winn, 132 Mo. loc. cit. 89.]

III.   Another contention is that because one of the di-
rectors told Mr. Lake and Mr. McCune that somebody con-
nected with the elevator had issued a warehouse receipt for
more wheat than they had in their elevator and inquired if

Lake's bank had it and said he was anxious to find it and secure it, this was a fraudulent effort to secure a fictitious debt. As a fact, however, no such receipt was ever found or secured and the whole property was given to secure a different debt. The company as such and its board which alone could execute or direct a conveyance to secure such receipt made no attempt to secure it, and so far as the proof goes it was a false alarm. Something more tangible than this remark is required to sustain an attachment.

Finally there was nothing contrary to good faith or good morals in providing for reasonable attorney's fees in the deed of trust. Both the bank and the mercantile company had become insolvent and the substance of the whole testimony on this question is, that the Mead Mercantile Company, protesting that they had been honest in their dealings, said to the assignee, "We will assign you all we have. We have nothing left. Take it and defend the title to it." The assignee had the right and duty required him to get counsel to advise him and protect the trust fund for the creditors of the bank.

We think the court correctly held there was no sufficient evidence to justify the submission of the issues to a jury and its judgment is affirmed. SHERWOOD and BURGESS, JJ., concur.