## FIRST NATIONAL BANK OF PLATTSBURG, Appellant, v. FRY.

### Division Two, May 13, 1902.

1. **Deed to Husband and Wife:** TENANTS BY ENTIRETY: SALE: OWNERSHIP OF PROCEEDS. A deed of gift to a husband and wife, made in 1874, created them tenants by entirety. Her interest in the lands was not her sole and separate equitable estate, but she had a legal estate therein, but her husband had the right of possession, and was entitled to the whole of the rents and profits during his lifetime. But if, without a previous agreement that she was to have one-half the proceeds of the sale of said lands, she joined with him in a deed thereto, and the cash for part payment thereof was paid to him, and the notes for the deferred payments made to him as sole payee, the proceeds were thereby reduced to his possession, and presumably by her consent, and at once became his property.

2. ——: ——: ——: ——: AS BETWEEN HER AND HIS CREDITORS: WAIVER. And where he invested such proceeds in other lands, and took the title in his own name, and subsequently used those lands as his own, thereby retaining the use of the proceeds which he had previously reduced to his possession, a note given to his wife for one-half the proceeds executed on a day subsequent to the execution and delivery of the deed to the entirety property, is not a waiver of his marital rights, but must be held, in law, in a suit between him and his creditors in attachment, voluntary and without consideration. And if this note (or subsequent ones given to her children in lieu thereof) was the consideration for a conveyance of such other lands to her children after her death, the conveyance as to his creditors was void.

3. ——: ——: ——: ——: ——: VALID CONSIDERATION. A wife may make the execution by her husband of a note to her, for one-half the amount of the proceeds of the sale of the property held by them as tenants by the entirety, a condition of her joining in the sale of the land, and thereby furnish a consideration which will support the note in equity as between them. But the making of such a note by him after he has received the proceeds of the sale and the deed has been delivered, without some previous or con-

National Bank of Plattsburg v. Fry.

temporaneous agreement by him, is a voluntary agreement, and the note is without consideration as to creditors.

4. ———: ———: TO LANDS IN OTHER STATES: COMMON LAW. In the absence of a statute to the contrary, it will be presumed that a deed of gift to a husband and wife of lands lying in another state, is governed by the common law, which created them tenants by the entirety, entitling him to the possession, and on the sale of the lands, without a previous agreement as to the distribution of the proceeds, to the entire proceeds.

5. **Fraudulent Conveyance**: DEED TO CHILDREN: SETTLEMENT AS CURATOR. In an attack upon defendant's deed to his children, as having been made to hinder his creditors, it is a pregnant fact, as bearing upon the integrity of his notes to them to pay which the deed was made, that in his settlements with the probate court as their curator he at no time inventoried or revealed the existence of such notes, but took from them a receipt in full of all claims against him, and such evidence is admissible for that purpose, but an instruction should be given that such facts should not defeat the conveyance if such notes actually were given and were valid, pre-existing obligations.

6. ———: ———: ———: KNOWLEDGE OF OFFICERS OF BANK. Knowledge of the cashier of a bank, who made defendant's court settlements as curator of his children, and of the president of the bank who was his bondsman as such curator, is knowledge of the bank, that in such settlements defendant took no account of the existence of his notes payable to such children.

7. ———: DELIVERY OF NOTE TO WIFE: DEED OF TRUST TO HER CHILDREN: INDORSEMENT. If defendant actually was indebted to his wife for the amount of his note made payable to her, it was not invalidated because it remained in his possession, nor affected by the fact that she indorsed it to her children and then delivered it to him, for it was theirs, on her death, by operation of law, nor was the mortgage given to the children by him, to secure the payment of renewal notes made by him to them after her death, in anywise affected by any such facts.

8. ———: FAILURE TO GIVE CREDIT FOR PAYMENTS. A deed of trust intended to secure the payees of notes in the payment of only what the maker actually owes them, is not invalidated by the fact that he honestly overlooked certain payments thereon, and mentioned as consideration for the instrument the face value of the notes. But a deed fraudulent in part is wholly so. So that where the deed of trust overstates the amount of the indebtedness it pur-

ports to secure, in the absence of a satisfactory explanation, it should be held, fraudulent.

Appeal from Daviess Circuit Court.—*Hon. E. J. Broaddus,* Judge.

REVERSED AND REMANDED.

*Alexander & Allen* and *H. T. Herndon* for appellant.

(1) The debts sued for in this case were fraudulently contracted by reason of the misrepresentations and concealments of his financial condition by the defendant. Bank v. Phillips, 22 Mo. 85; Blackwell v. Fry, 49 Mo. App. 638. (2) "Where one intentionally misrepresents a material fact, or produces a false impression in order to mislead another, or to entrap or cheat him, or to obtain an undue advantage over him, it will constitute actual or positive fraud in the truest sense of the terms. And the misrepresentation is not confined to words or express assertions, but may consist of deeds, acts or artifices to mislead." Bank v. Crandall, 87 Mo. 209. (3) The rights of defendant's children, if any, can not prevail against the claims of attaching creditors. Riley v. Vaughn, 116 Mo. 169; Humes v. Scruggs, 94 U. S. 23; Bank v. Hamilton, 34 N. J. Eq. 162; Benson v. Eveland, 26 N. J. Eq. 471. (4) The transfer by deed of trust of a large part of his real estate to his children was fraudulent as against the rights of creditors, for the reason that it was a voluntary conveyance. The note from defendant to his wife, Anna E. Fry, was void in law and equity, was founded upon no valuable consideration, and all renewals of the note were likewise invalid. Jackson v. Park, 10 Cush. 550; Sweat v. Hall, 8 Vt. 187; Parsons on Bills and Notes, 173; Russell v. Brooks, 7 Pick. 65; Alexander v. Alexander, 85 Va. 353. (5) The title to the money derived from the sale of the real estate of defendant and his wife vested in the husband by operation of law. And

when a wife sells her real estate and allows the proceeds to be collected by her husband, such proceeds become the property of the husband at common law. Tillman v. Tillman, 50 Mo. 40; Sloan v. Terry, 51 Mo. 626; Terry v. Wilson, 63 Mo. 495; Kesner v. Trigg, 25 U. S. 83. (6) The land sold by defendant and his wife in 1874 was not the separate estate of Anna E. Fry, but the deed from Benjamin Deyerle to her and her husband made them tenants by the entireties, and she had only a contingent interest in the land. Hall v. Stephens, 65 Mo. 670; Baines v. Babcock, 129 Mo. 117; Speier v. Opfer, 73 Mich. 35. (7) The right of Mrs. Anna E. Fry, under the facts in this case, and consequently any right which she may have transferred to her children, as claimed by the defendant, was, at best, but a mere equity; and even if the contract was valid between the parties, was subject to the right of creditors. Terry v. Wilson, 63 Mo. 495. (8) There was no gift of the note from Mrs. Fry to her three children because there was no delivery. Gammon Theological College v. Robbins, 128 Ind. 85; Walsh's Appeal, 122 Pa. 177.

*John A. Cross, Hamilton & Dudley* and *Sandusky & Sandusky* for respondent.

(1) While at common law the personal property of the wife, on her marriage, became the property of the husband, yet he could waive this marital right, and by so doing make it the wife's exclusive and separate property. When the Virginia land was sold the defendant waived his marital right to his wife's half of the proceeds, and executed to her his note for that amount. The effect of this was to make him debtor to his wife for that sum, and to make that sum her sole and separate property. Clark v. Clark, 86 Mo. 114; McCoy v. Hyatt, 80 Mo. 130; Roberts v. Walker, 101 Mo. 601; Cox v. Cox, 91 Mo. 77; Hammons v. Renfrow, 84 Mo. 332; Boths v. Gooch, 97 Mo. 88; Morrison v. Thistle, 67

Mo. 596; Cooper v. Standley, 40 Mo. App. 139; Bethel v. Bailey, 35 Mo. App. 463. (2) While in a conveyance or gift from a third person to a married woman she takes no separate estate, unless words are used vesting the estate to her sole and separate use, yet, in a gift or conveyance, or note from the husband direct to the wife, no such words are necessary. Pitts v. Sheriff, 108 Mo. 115; Turner v. Shaw, 96 Mo. 27; Denning v. Williams, 26 Conn. 226; 3 Pomeroy's Eq., sec. 1100, note 1; sec. 1101, note 1; Clark v. Clark, 86 Mo. 123; 1 Bishop on Married Women, sec. 838; Roberts v. Walker, 101 Mo. 601. And a trustee is not necessary. Holthaus v. Hornbostle, 60 Mo. 439; 10 Ohio 371, a case of note from husband to wife. (3) The indorsement of the note for $6,741.30 by Ann E. Fry to her children, was a valid transfer to them. Schouler on Husband and Wife, secs. 238, 248; Wisdom v. Shanklin, 74 Mo. App. 430; McClain v. Weidemeyer, 25 Mo. 364; Menkens v. Heringhi, 17 Mo. 297; Morcau v. Branson, 37 Ind. 195. The delivery to her husband, for the children, of her husband's note, made him trustee of the fund for the children. (4) In the absence of actual fraudulent intent, the failure of the defendant to credit the children's notes with the various payments made to and for them, entries of which were kept in a book, and the failure, by oversight, to mention the credits in the deed of trust, did not invalidate the deed of trust. An incorrect statement of the debt secured or an overstatement, if made by mistake or oversight, will not render a mortgage fraudulent. Russell v. Letton, 56 Mo. App. 546; Bank v. Mercantile Co., 151 Mo. 149; Nazro v. Ware, 38 N. W. 359. A mortgage to secure future advances is necessarily indefinite; and it may simply name a fixed sum, and it will be sustained for the actual indebtedness. Foster v. Reynolds, 38 Mo. 553. (5) As to defendant's settlements with his children in the probate court. There was no notice of final settlement, and no exhibit served as required by statute. R. S. 1889, sec. 3529; State to use v. Hoster, 61

Mo. 544; Murphy v. Murphy, 2 Mo. App. 156.   The defendant was appointed curator in 1885, to receive money coming to the children from Benjamin Deyerle's estate.   If he simply erred, and there was no intent to conceal or defraud, then this error does not invalidate the deed of trust to the children.   If defendant was trustee for the children for the fund coming from their mother, then his accounts as trustee would be properly rendered in the circuit court.   The defendant could not avoid his indebtedness to his minor children, and perpetrate and perpetuate a fraud on them, by failing to account for this indebtedness in the probate court.

   GANTT, J.—This action was instituted by attachment in the circuit court of Clinton county, on June 25, 1898, on four promissory notes executed by defendant to plaintiff, aggregating $4,884 exclusive of interest.   A change of venue was awarded to Daviess county, and in December, 1898, was tried on a plea in abatement before a jury, who returned a verdict for defendant on that issue, and after an unsuccessful effort to obtain a new trial and after judgment for plaintiff on the notes, the plaintiff appealed to this court:

   The grounds alleged for attachment were:   that the defendant had fraudulently conveyed or assigned his property or effects so as to hinder or delay his creditors; that the defendant had fraudulently concealed, removed or disposed of his property or effects, so as to hinder or delay his creditors; and that the debts sued for were fraudulently contracted.   As much of the evidence is of a documentary nature, there is little dispute as to many of the facts.

   For a number of years prior to the institution of this suit the defendant, Emanuel Fry, was the owner of about seven hundred acres of farming lands in Clinton county, estimated to be worth about $30,000, all of which was unincumbered, until on July 1, 1896, when he mortgaged about 425 acres

   Vol 168 mo—32.

thereof to the Massachusetts Life Insurance Company to se-
cure $7,500 that day borrowed from said company.   Defend-
ant also owned a lot of cattle, hogs, and other stock usual on
such a farm.

. On June 25, 1898, the defendant made various convey-
ances and mortgages by which he disposed of all of his prop-
erty both real and personal, except enough to pay the interest
on the insurance company's mortgage, and his household
goods.   He conveyed to his wife, Mrs. Amanda Fry, through
an intermediary, 105 acres of land on which his house and
farm buildings were situated for the recited consideration of
$5,961.22.   To his brother, Louis D. Fry, 55 acres for $3,025,
by warranty deed.   He executed a deed of trust on 320 acres,
subject to the insurance company's mortgage, in favor of his
three children, Mrs. Julia V. Rennick, Galen B. Fry and Miss
Bessie Fry, to secure them, each, respectively, $5,997.81 on
notes of date March 2, 1891, and due six years after date with
eight per cent compound interest.   To his daughter, Miss
Bessie M. Fry, he gave a chattel mortgage on part of his live
stock and farm machinery to secure a note to her for $403,
and a chattel mortgage on farm machinery and part of a grow-
ing crop to Thomas and John T. Fry to secure notes to the
amount of $250, and to the plaintiff, the National Bank of
Plattsburg, a chattel mortgage on 110 head of stock hogs and
some growing corn to secure a note for $164 and an overdraft
for $225.   On the same day he sold to his brother, Abram S.
Fry, 25 head of beef cattle for $1,405, and to Samuel Thomp-
son corn in crib for $400.   On June 24, 1898, he sold 72 stock
hogs for $450.   On June 25th he also executed a deed of
trust, conveying 180 acres of other lands to secure other cred-
itors, including the plaintiff, their debts amounting to about
$20,000, all of which was borrowed money.

In this attachment plaintiff assails particularly and chiefly
the deed of trust given to defendant's children.   The mother
of these children was defendant's first wife, whose maiden

name was Ann E. Deyerle, the daughter of Benjamin Deyerle of Roanoke county, Virginia, to whom defendant was married in 1867 in Virginia. Of that marriage three children were born, Julia V. Fry, married to Abram Rennick and who since her marriage has resided in Kentucky, Galen Fry, a son, who was in Alaska when these conveyances were executed, and Miss Bessie Fry, an unmarried daughter.

Mrs. Fry died in 1879 and at that time her three children were aged respectively, twelve, seven and three years. In 1874 defendant's father-in-law, Benjamin Deyerle, made a deed of gift jointly to defendant and his wife, Anna Eliza Fry, of 454 acres of land in Franklin county, Virginia, which deed was filed for record March 2, 1874. On February 9, 1874, and before he and his wife had received their deed, defendant had contracted to sell this land to Henry C. Chapman, and on February 27, 1874, he and his wife made a deed to Chapman for $12,000, of which $4,200 was paid down and Chapman gave his notes for the deferred payments as follows: $1,796, September 1, 1875; $3,000, September 1, 1876; $3,000, September 1, 1877, all bearing date February 27, 1874, said Fry and wife reserving a vendor's lien on said land to secure said payments. Chapman defaulted, and on May 10, 1879, defendant instituted suit in the circuit court of Franklin county, Virginia, to enforce the vendor's lien and recovered judgment, and at the sale thereunder, defendant received $5,607.60, in full of amount due on said sale. These notes were all payable to Emanuel S. Fry and the suit brought in his name.

To prove the indebtedness to his children, the defendant, over the objections of the plaintiff, offered and read in evidence an old note from himself to his wife, Anna Eliza, dated Salem, Virginia, March 2, 1874, for the sum of $6,000, due two years after date, with interest from date at the rate of six per cent per annum. Defendant also introduced evidence for the purpose of showing that this note was given to his first wife

in consideration of one-half the purchase price of the land sold by them to Henry C. Chapman as above set out.

Defendant next offered and read in evidence, over the plaintiff's objections, a note from himself to his wife, Anna Eliza, dated March 2, 1876, for the sum of $6,741.30, due six years after date, with eight per cent compound interest thereon from date, and indorsed on the back in purple pencil as follows:

"Keep renewed to my three children, Julia V., Galen B. and Bessie M. Fry, and pay it to them whenever you think best.

"A. E. FRY."

Defendant testified this was a renewal note for the original note to his wife for $6,000.

Defendant further explained his indebtedness to his children by stating that his wife, Anna Eliza, died in the year 1879, and that afterwards, on March 2, 1882, he divided the amount owing on the note to his wife into three equal parts and executed notes payable to his three children, respectively, each note of that date and for the sum of $3,565, due six years after date, with interest from date at the rate of eight per cent per annum, to be compounded if not paid annually, and payable, respectively, to Julia V., Galen B. and Bessie M. Fry.

Defendant next offered and read in evidence, over the objection of plaintiff, what purported to be renewal notes of the above, dated March 2, 1891, and each for the sum of $5,997.81, due six years after date, with eight per cent compound interest per annum from date, and payable, respectively, to Julia V. Renick, Galen B. Fry and Bessie M. Fry.

The evidence shows that Julia V. Fry came of age in the year 1888, and was married to Abram Rennick in the year 1890, moved to the State of Kentucky on her marriage, and has resided there since that time; that Galen B. Fry, after he

reached his majority in 1891, resided principally in Plattsburg, Missouri, until the year 1898, when he went to Alaska; that Bessie M. Fry resided with her father and his second wife and came of age in the year 1896.

Defendant testified on cross-examination that he had always retained possession of these notes until after the beginning of this suit, when he had delivered the notes secured by deed of trust to Mrs. Rennick and his daughter Bessie; that Galen B. Fry's note had never been delivered to him and had never been in his possession. The testimony of Julia V. Rennick and Bessie M. Fry is substantially to the same effect.

To secure the payment of these three notes, the defendant, as hereinbefore stated, on June 25, 1898, made a deed of trust to Luther Finch, trustee, conveying 320 acres of land, variously estimated to be worth from forty-five to sixty dollars per acre, subject, with one hundred and five acres of other land, to a deed of trust to the Massachusetts Life Insurance Company for the sum of $7,500, placed thereon in 1896.

In the year 1885, the defendant was appointed guardian and curator for his three children, Galen, Julia and Bessie M., by the probate court of Clinton county, Missouri, and proceeded to give bond, file inventory and make annual and final settlements from time to time until all the minors became of full age. Neither in the inventory, nor in any of the annual or final settlements with the probate court, did the defendant charge himself with the three notes from himself to his children, nor was any mention ever made of them, but the only sums charged against himself were moneys received from sale of land belonging to the estate of his wards' grandfather in Virginia, amounting primarily to the sum of $570.65. The children from time to time, as they became of age, executed receipts to defendant as curator in full payment of what he owed them on final settlement.

The defendant for many years had been a customer of the plaintiff, the First National Bank of Plattsburg; was a rel-

ative of the president and cashier of the bank, and the cashier testified that he had known the defendant all his life and their relations had always been intimate and friendly, and that defendant had often consulted him even about his business af- fairs. In the year 1896 defendant asked witness what he thought of him getting an Eastern loan on his farm for $7,500 for five years, and stated that this sum would enable him to pay off all or nearly all his indebtedness and would give him plenty of time so that he would not be pressed for money. Neither at this nor at any other time did defendant tell wit- ness that he owed his children any money, nor did he disclose to witness the extent of his indebtedness, but at the time the $2,000 note in suit was made he stated to witness that he had plenty of money to pay all his debts. Witness also prepared a part of the settlements of defendant as curator for his chil- dren, and testifies that he prepared the final settlements as to Bessie M. Fry and Galen B. Fry, all the previous settlements being prepared by James M. Riley, who was dead at the time of trial.

O. P. Riley, president of the plaintiff bank, testified that he had known the defendant ever since he was a boy; that they were first cousins, and that defendant had been doing business as a depositor and borrower with the bank since the time wit- ness was connected with it, which was seven or eight years; that he had a conversation with the defendant in 1896 regard- ing the eastern loan of $7,500, and that defendant asked him what he thought about it. In this conversation defendant told witness he could use this money to pay off what he owed, and have probably $2,000 left. Witness further testified that he negotiated the loan of $1,300, evidenced by the note in suit, signed by the defendant and Galen B. Fry. Defendant first spoke to him about the matter and said he wanted to borrow some money for Galen, and that Galen wanted to go to Alaska and would take out a life insurance policy to indemnify de- fendant in case he should not return or should die before the

note was paid. Witness made the loan and stated to the defendant that the bank would look to him for its payment. Witness further stated that he never heard of the alleged indebtedness of defendant to his children until the deed of trust in their favor was filed; that he was a surety on the bond of defendant as guardian for his children, and at one time investigated defendant's accounts in the probate court; that had he or the other officials of the bank known of the alleged indebtedness of defendant to his children or his present wife, or the extent of his debts to other parties, the bank would not have loaned him any money.

A. K. Porter, one of the creditors of the defendant, testified that he had frequent conversations with the defendant about his indebtedness to him since it accrued, about seven or eight years back. On the occasion of the defendant placing the mortgage on his land in 1896, witness became somewhat uneasy about his debt and talked to the defendant about his financial condition, at which time, and at various other times, defendant told witness that he had more than enough property to pay all his debts and stated that his land alone was worth $30,000 or $35,000, and that it was more than double what he owed. Witness made the loan to defendant for Mrs. Deneny and for Mrs. Eva Swan, and consequently knew at this time of $16,000, including the eastern loan, that the defendant owed. In the years 1897 and 1898, defendant made like statements of his ability to pay his debts to T. H. Swan and Agnes R. Riley, other creditors of his.

Defendant also stated to H. B. McIntyre in the year 1897, on the occasion of his giving McIntyre a note for $150 for a board bill that Galen owed McIntyre, that Galen did not have any money then except an undivided interest in some land in Virginia, and that his uncle said the land was not in shape to sell then to an advantage, but after awhile Galen would have some money when the estate was sold.

Immediately before Galen started for Alaska, defendant

had a conversation with Miss Juliette Osborne in regard to Galen going to the Klondyke, in which conversation defendant stated that it was a foolish thing to do; that he had offered to give Galen a farm or furnish money to go to Alaska, if he was bent on going, and that he was not going to do anything for him thereafter. This conversation was also testified to by Miss Cordelia Osborne.

For several years preceding the conveyance of his property, defendant was indebted to Mrs. J. B. Deneny, who then resided at Fayette, Missouri, in the sum of $1,000, evidenced by note. In June, 1898, J. B. Deneny wrote to defendant that he desired that the note be paid at maturity, which was some time during that month. On June 14, 1898, defendant acknowledged receipt of the letter and promised to pay the note at maturity and on June 18th defendant again wrote Deneny stating that he was disappointed in getting some money, but promised to pay the interest on the note and probably as much as five or six hundred dollars of the principal. The note in the meantime had been sent to the Clay & Funkhouser bank for collection. On receiving a reply to this letter that the note would have to be paid, the defendant again, on the 21st day of June, wrote to Mr. Deneny, promising to pay the note as speedily as possible, probably in a few days. The evidence shows that defendant at the time he was writing these letters and making promises of payment of the note to Mr. Deneny, was contemplating the conveyance of his property in the manner hereinbefore stated.

The defendant, to sustain the issues on his part, first offered and read in evidence the depositions of James D. and Henry S. Deyerle, taken at Salem, Virginia. These witnesses were brothers of defendant's first wife, and gave evidence tending to prove the execution of and to identify the note from defendant to his wife, dated March 2, 1874; the deed from Benjamin Deyerle and wife to Emanuel S. Fry and Anna Eliza Fry, his wife, dated February 27, 1874; the contract

between Fry and Chapman for the sale of the land, dated February 9, 1874, and the handwriting on the back of the note from Fry to his wife, dated March 2, 1876.

Defendant's two daughters, Julia V. Rennick and Bessie M. Fry, testified about the notes to them from their father, and stated that the notes were never in their possession until after the assignment of his property by defendant, but stated that they knew of their existence and of the estate of their deceased mother in Virginia.

Defendant also introduced as a witness a brother-in-law named Todd, who testified he was present at Mr. Fry's house a few days before Anna E. Fry died, defendant being also present; that Anna E. Fry had a note in her hands and said it was a note from her husband to her and was to be kept for her children. To the testimony of this witness the plaintiff objected and moved to strike out the same; all of which objections were overruled by the court, and plaintiffs excepted.

When the defendant returned from Virginia to Clinton county, Missouri, after the sale of the Virginia land, he bought something over 400 acres of land in Clinton county, which cost between $9,000 and $10,000 and began farming on a large scale. He cleared this land of timber, brush and stumps, built two houses, barns, etc., at a cost of about $9,000. He borrowed from $13,000 to $14,000, running at ten per cent compound interest.

As he needed money he borrowed it, and no person asked him for security in making a loan, except in 1896, when he borrowed $7,500 Eastern money. He renewed notes from year to year, and if anyone wanted his note paid he would borrow the money and pay it. From 1880 to June 25, 1898, when he turned over his property to his creditors, he had executed sixty-three notes to the Clay & Funkhouser bank, at Plattsburg, twenty-three notes to the First National Bank, at Plattsburg, and eighty-seven notes to various persons. Until 1889 these notes ran at ten per cent compound interest, and there-

after at eight per cent. Upon these notes the defendant paid over $14,000 interest; and upon the notes sued on by the nine attaching creditors, there are credited interest payments aggregating about $3,500.

Defendant also introduced evidence tending to prove his indebtedness to John T. Fry and Thomas Fry, and showed that he received from his second wife, Amanda M. Fry, during a few years succeeding his marriage, the sum of $1,624, which, with the interest accrued on notes he had given her, amounted at the time of his conveyance to her to the sum of $5,961.22.

The defendant offered himself as a witness in his own behalf, and in a lengthy examination by his counsel testified as to the indebtedness to his children, and to his present wife, and offered in evidence the mass of notes and bank checks above mentioned to show the disposition of the money he had obtained from his various creditors, and denied that he had any purpose, in making the assignment of his property, to hinder, delay or defraud any of his creditors, or to conceal any of his property or effects, and stated that he was trying to make an equal distribution of his property. Upon cross-examination he stated that the indorsement on the back of the note to his first wife, dated March 2, 1876, was made by her four or five days before she died; that she died of consumption and for some time before her death she was very feeble; that she had to be carried in and out of her bed for a week or two before she died.

The plaintiff, in rebuttal, introduced expert witnesses tending to prove that the signature on the back of the note from defendant to his wife, dated March 2, 1876, was not the signature of A. E. Fry. The defendant then introduced evidence of various expert witnesses to prove the genuineness of the signature.

Defendant was married a second time on November 8, 1883, to Miss Amanda Trimble. A detailed statement of the property owned by her at that time was offered in evidence,

consisting of bank deposit and notes and cash received from her grandmother's estate, aggregating $1,624. On March 4, 1884, he gave her notes for these moneys, one for $1,124 and another for $500. From time to time the interest was added in, and on July 23, 1896, she held his note for $5,000, and it was in this shape when he made her the conveyance of 105 acres June 25, 1898.

Eight other creditors attached at the same time plaintiff did. As already stated, plaintiff endeavored to sustain its charge of fraudulent conveyance and disposition of property by defendant, by proof tending to show that the deed of trust executed in behalf of defendant's three children was fraudulent. To sustain this charge it insisted that Mrs. Ann E. Fry, the mother of these children, did not sign the indorsement of the $6,741.30 note of defendant to her; that the alleged renewal notes to the children were never delivered to them and therefore constituted no indebtedness of defendant to them; that neither defendant nor his children regarded said notes as an indebtedness because, when in 1885 he was appointed their curator to receive and receipt for their share of an estate in Virginia, he did not charge himself with said notes, and when they reached their maturity he settled with each of them, and they took no account of said alleged notes; and finally that according to defendant's testimony he was entitled to large credits for moneys advanced to his children after their majority, and although he held said notes in his own hands he did not indorse any credits thereon, but executed the deed of trust and placed it on record for the full amount, thus fraudulently asserting to the world that he owed the whole amount when he knew to the contrary.

I. The action is one at law and the given and refused instructions indicate the theory upon which the circuit court tried the cause. Plaintiff complains of the refusal of the first instruction which directed the jury to render a verdict sustaining the attachment; that is to say, conceding full credence to

all the testimony in behalf of defendant, his conveyance by deed of trust to his three children to secure the alleged notes by him to them was voluntary, without consideration, and fraudulent as against attaching creditors.

In tracing the consideration of this alleged indebtedness to his children, there is no conflict as to its origin.  On February 27, 1874, Benjamin Deyerle, by deed of gift, for the express consideration of love and affection, conveyed to defendant and his wife, Mrs. Anna E. Fry, 454 acres of land in Franklin county, Virginia, and on the same date defendant and his wife by their joint deed conveyed the same land to Henry C. Chapman, who paid $4,200 of the purchase money in cash to defendant and gave his notes to defendant alone for the deferred payments, which notes defendant afterwards collected in his own name.   Afterwards on March 2, 1874, defendant executed a note for $6,000, of that date, whereby he promised to pay his said wife said sum two years thereafter. There was evidence tending to show this note was not executed the same day the deed was delivered to Chapman, but afterwards.   The notes described in the deed of trust of June 25, 1898, to secure defendant's three children, all have their origin in the $6,000 note of March 2, 1874, and are, according to defendant's evidence, renewals thereof. They are based upon the same consideration.

The legal effect of the deed from Benjamin Deyerle to defendant and wife was to create them tenants by the entirety of the Franklin county lands.   Her interest in these lands as tenant by the entirety with her husband was not her sole and separate equitable estate, but she had a legal estate therein, and in addition to his seizin by the entirety with her, defendant, her husband, had the right of possession, and was entitled to the *whole* of the *rents and profits during his lifetime,* and when she joined with him in the conveyance to Chapman on March 2, 1874, and the purchase money was partly paid in cash to defendant and the notes for the deferred payments ex-

ecuted to him alone, the proceeds of said land were then reduced into his possession, and by her presumed consent, and at once became his property. [Tillman v. Tillman, 50 Mo. 40; Hall v. Stephens, 65 Mo. 670.]

While conceding this to be the legal effect of the sale of said lands and the reduction of the purchase money into possession by the husband, learned counsel for defendant urge that it was competent for him to waive his marital right to his wife's contingent interest therein and thus make it her separate property, and cite numerous decisions of this court to sustain their contention, among others Clark v. Clark, 86 Mo. 114. In that case a wife had inherited certain moneys and retained the exclusive possession thereof and afterwards loaned them to her husband, taking his note with his brother as surety. From time to time they made her payments thereon. It was held that while, by the common law then in force, the money owned by the wife became the property of the husband, he might waive the same and permit her to retain it, and if instead of asserting his marital right and reducing it to possession he elected to borrow the same, he would in equity at least be regarded her debtor, but observed the court, "Contracts of this character made between husband and wife are held to be void *as to injured and complaining creditors.*"

In McCoy v. Hyatt, 80 Mo. 130, it was held that a separate estate in personal property in the wife may be established from the fact of her long and uninterrupted control of it by and with the acquiescence of her husband.

In Roberts v. Walker, 101 Mo. 597, it was ruled that it was competent for the husband and wife by an antenuptial agreement not in writing, and by a subsequent uniform course of conduct, to invest her antenuptial chattel property with the character of a separate equitable estate, *as between themselves* and those in privity between them.

In Morrison v. Thistle, 67 Mo. 596, it was held that where a wife had a sole and separate estate in land she was in

regard thereto a *feme sole,* and could in equity bind it by her promissory note.

In Cox v. Cox, 91 Mo. 71, it appeared that a husband bought real estate with certain moneys belonging to his wife, which he held not by marital right, but in trust for her, and caused the deed thereto to be executed to her, and it was held not liable for his debts.

In Hammons v. Renfrow, 84 Mo. 332, it was held that while the husband by the common law was entitled to the money and personal property of his wife in possession, yet he might by *clear and unequivocal acts* acquire and so hold and manage the same as to exclude his marital rights.   That was a contest between the heirs of the wife and her husband's estate, and the rights of creditors were not involved.

. These cases, relied upon by counsel for defendant, may be divided into two classes: those in which by mutual agreement between husband and wife, followed by a uniform course of conduct, the husband treats the wife's property *as her own* and does not assert his marital rights thereto, and as between them and their privies the agreement is sustained by the courts; and the other class is where the property is shown to be her separate estate.   With the latter cases we are not concerned in this case.

Did the defendant's evidence bring him within the first class ?   This is not a contest between the heirs or legal representatives of Mrs. Anna E. Fry and her husband, but it is an action by the creditors of her husband to subject his property to their claims, and her husband to defeat their attachments is attempting to show a valid debt to his wife and through her to his children.   Their notes have no other foundation than the voluntary note given by their father to their mother in 1874, as he asserts, for her half of the proceeds of the Virginia lands, which he had already reduced into his possession. Having joined with him in the conveyance of her interest in the land, she thereby consented to his reducing the proceeds

into possession, and when he took the purchase money it became his property. His subsequent use and retention of that purchase money could not constitute any consideration for the note which he voluntarily executed to her "as in such case he would only be using what was already his own," and in transactions between husband and wife the same distinction is to be observed between those which are supported by a valuable consideration and those which are not, that obtains between other persons. [Terry v. Wilson, 63 Mo. 493.]

In Sloan v. Torry, 78 Mo. loc. cit. 626-7, this court said: "No condition was attached by Mrs. Torry to the sale of her land. True, it could not be disposed of without her consent; but when disposed of, as the land was not her separate property, the proceeds were not her separate property, and being choses in possession and not protected by the statute, the husband could lawfully use the same, and no subsequent promise by him to pay her back would make her his creditor so as to justify the preference attempted in her behalf by the conveyance from Evans to her. She took subject to the claims of the creditors. If the real property in Lousiana had been disposed of upon a prior or contemporaneous promise of the husband to hold the proceeds for her, or to account for the same, she would then stand as a general creditor, and the preference in her favor could be upheld."

We are thus brought to a consideration of what agreement, if any, was made by defendant prior to the sale of the Virginia lands that he would hold the same to her separate use and not as his own.

And first as to his intention to reduce it to his own possession. It appears that on February 9, 1874, and prior to the deed from Benjamin Deyerle to him and his wife, he entered into a written contract with Chapman in his own name, to which his wife was not a party, to convey him these Virginia lands for $12,000. On February 27, 1874, defendant and wife made the deed to Chapman, and Chapman paid

$4,200 cash to defendant, and executed his notes to defendant alone for the deferred payments. Subsequently, when it became necessary to sue on those notes, he alone was the plaintiff in the cause and received the money. According to his testimony he invested the whole of this purchase money in Clinton county lands and took the deed in his own name. Prima facie his receipt of the money was a reduction into possession by virtue of his marital rights. [1 Bishop on Married Women, sec. 114.]

There was no investment at any time of any part of the proceeds in her name. There is no evidence that prior to or at the time the defendant and his wife conveyed their lands to Chapman he agreed that he would give his wife one-half of the proceeds of the sale, or that she should receive her husband's note for the amount of one-half of the proceeds. There was an effort to show by one of Mrs. Fry's brothers that the note and deed were executed the same day; but he was testifying to a transaction that had occurred twenty-four years prior and when his attention was called to the fact that the deed was acknowledged on February 28, 1874, and the note was executed on March 2, 1874, and that the deed was recorded on that day and the county seat was twenty-eight miles distant, and there was no railroad connecting the county seat with the residence of Benjamin Deyerle, at which the deeds were executed, he was unable to explain his testimony to the effect that he was under the impression that the note and deed were made the same day. There was no evidence that defendant made any "positive, precise and clear declaration of trust" for the benefit of his wife as to one-half of the proceeds of the lands. The case stands alone upon the execution of a note by defendant to his wife *after he and she had sold the land,* and so far as the evidence throws any light upon the transaction, was a purely voluntary act on the part of the husband. While the wife might have made the execution of the note to her by her husband a condition of her joining in the sale of her land, and

thus furnished a consideration which would have supported the note in equity, as between them, *the making of the note afterwards* without such previous or contemporaneous agreement by the husband, would be a voluntary agreement without consideration as to creditors. [Woodson v. Pool, 19 Mo. 340.]

When the rights of creditors are involved, transactions like this between husband and wife are to be scrutinized with the most jealous care. As there was no prior or contemporaneous promise of the husband at the time they sold the Virginia lands, and as he immediately reduced the purchase money to his possession in the most unequivocal manner, and as by the common law, which we must presume in the absence of proof of a statute to the contrary, existed in Virginia at that date (Meyer v. McCabe, 73 Mo. 236), the title to the purchase money vested at once in the husband, the wife did not own the $6,000 for which her husband gave her his note, because it already belonged to him in his own right, and the said note was *nudum pactum*. [Benne v. Schnecko, 100 Mo. 250; Modrell v. Riddle, 82 Mo. 31.]

As was said in Terry v. Wilson, 63 Mo. loc. cit. 499, where "the chattels and money are choses *in possession* and not *choses in action,* if the husband uses the same and executes to her his promissory note therefor, we do not see how she can thereby claim to be his creditor or stand in any other relation to him, as payee of such note, than that of a mere volunteer. The use of the money would certainly constitute no sufficient consideration for the promise, as in such case he would only be using what was in law already his own."

No new consideration entered into the renewal notes voluntarily executed by defendant to his children, as they were the same old obligation in a new form only.

If, then, we are right in holding that in the state of the evidence the notes of defendant were entirely voluntary and without consideration, when he gave the deed of trust to

Vol 168 mo—33.

secure them on June 25, 1898, it was a voluntary conveyance, an attempt to give them his lands and was fraudulent as against his creditors, and the court erred in refusing plaintiff's first instruction.

While it is the right of the defendant to have the jury pass upon all controverted questions of fact, when the rights of the parties depend upon the legal effect of written instruments it is the right and duty of the court to declare their effect, and as the validity of the deed of trust in favor of defendant's children depends upon whether defendants owed them the debt for which he executed said deed of trust and conceding all that defendant proved as to the consideration and the execution of said notes, it appears that they were without consideration, it would have been no invasion of the province of the jury to have told them in effect as plaintiff's first instruction asked the court to declare, that said notes were without consideration and the deed of trust to secure them was voluntary and therefore void, and that the attachment should be sustained.

II.  Among other instructions plaintiff asked the following, which the court refused, to which refusal plaintiff at the time excepted:

"No. 3.  The court instructs the jury that it was the duty of the defendant, as guardian and curator of his children, to make a true accounting of all the goods and chattels, rights and credits of his said minor wards, not derived from the defendant, in his possession or knowledge, and to account therefor in his annual and final settlements with the probate court; and the officers of the plaintiff bank, in the absence of notice or knowledge to the contrary (if such was the fact), had a right to presume that defendant, in his annual and final settlements as guardian and curator as aforesaid, had charged himself with all the goods and chattels, rights and credits belonging to said wards in his possession or knowledge, and not derived from him; and the fact, if it is a fact, that defendant

failed to so charge himself is a circumstance to be taken into consideration with all the other facts and circumstances in evidence."

For the defendant the court gave the following instruction, numbered 11:

"No. 11. In reference to said deed of trust dated June 25, 1898, executed by defendant to Luther Finch, as trustee, to secure said notes, dated March 2, 1891, to Julia Renick, Galen Fry and Bessie Fry, the court instructs the jury as follows: If the jury find from the evidence that the defendant, on June 25, 1898, was indebted to said parties, as set out in instruction numbered 10, and if the jury further find from the evidence that the defendant, in 1885, was appointed guardian for his children, and at that time received for them certain moneys from Virginia from the estate of Benjamin Deyerle, deceased, which he accounted for in the Clinton County Probate Court, until they respectively arrived at age, but that the defendant did not, in his guardianship, account for the said notes dated March 2, 1891, but treated said notes as a separate matter, then the failure of the defendant to render an account for said notes in said guardianship, did not take away nor destroy his indebtedness to said parties, but said indebtedness remained and the defendant had the legal right to secure it. And this is true, although said parties, when they arrived of age, acknowledged in open court the payment to them by the defendant of all moneys due them, provided said debts represented by said notes had not, in fact, been paid, and were understood by the parties not to be included in the settlement."

Counsel for defendant insist that plaintiff's third instruction was properly refused because it would have been a comment on the evidence, is abstract and misleading, and that there was no evidence that the bank knew anything about it.

In view of the eleventh instruction for defendant, we can not agree that it would have been a comment on the evidence. The jury were told that if they found that defendant in his

accounts with his three children as their curator failed to charge himself with all the goods, chattels, rights and credits of his said wards, it was a circumstance to be taken into consideration with all other facts and circumstances in the case, and that the officers of plaintiff's bank in the absence of notice to the contrary (if such was the fact), had a right to presume he had so charged himself as it was his duty to do.

In view of the position that the defendant was maintaining before the jury that he and his children regarded these notes to his children as a bona fide debt and that he had been the curator of his children in the county where the plaintiff bank was situated and had only charged himself with about $500 received from the estate of his children's grandfather, his failure to charge himself was a most pregnant circumstance, and certainly as the court had advised the jury that if they found that notwithstanding his neglect to charge himself as curator, still if he owed the notes, such failure would not affect the deed of trust, simple justice required that their attention should be called to the fact that he had not so charged himself, as bearing upon the integrity of the charge as a foundation for the deed of trust. As to the knowledge of the bank officials of defendant's accounts as curator, O. P. Riley testified he was president of the plaintiff bank and was on defendant's bond as curator for his children and had examined his accounts as such after he had settled with two of the children, but had not settled with Miss Bessie yet; that he never learned of his alleged indebtedness on the notes secured by the deed of trust until after the deed of trust was executed.

George R. Riley testified he had been cashier of the plaintiff bank since 1891, and had prepared some of the annual settlements and the final settlement of defendant with his daughter, Miss Bessie Fry. Thus both the president and cashier of the bank had actual knowledge of defendant's accounts with his ward, and no knowledge of the large notes which defendant secured by his deed of trust June 25, 1898.

We think the instruction is not objectionable in its reference to the knowledge of the bank's officers. The bank could only know through the knowledge of its officers. Having this actual and intimate acquaintance with his accounts as curator, it is difficult to see how they could have failed to take an account of them when they were loaning him money, and their evidence shows they relied upon those records. Our conclusion is that the court should have given the instruction, and erred in refusing it.

III. Plaintiff assigns as error the giving of the tenth instruction for defendant, which is as follows:

"No. 10. In reference to the validity of the indebtedness from the defendant to Julia Renick, Galen Fry and Bessie Fry, represented by the three notes dated March 2, 1891, the court instructs the jury as follows: If the defendant, on March 2, 1874, executed to his wife, Ann E. Fry, the note for $6,000 read in evidence, for her interest in the proceeds of the sale of certain land in Virginia, which had been deeded to them jointly, and if defendant renewed said note to his said wife March 2, 1876, and his said wife in 1879 signed her name to the indorsement on said note and thereby indorsed said note to Julia Renick, Galen Fry and Bessie Fry, and delivered the same to defendant, then the defendant became trustee of said fund for said children, and although the renewal notes dated March 2, 1882, and March 2, 1891, may have been signed and put away among defendant's papers, and not delivered to said children, they were nevertheless evidence of the trust fund owing from the defendant to his said children, and if the deed of trust executed by the defendant, June 25, 1898, to Luther Finch, as trustee, was executed for the sole purpose of securing said trust fund so evidenced by said notes, dated March 2, 1891, to the extent of the indebtedness due, then said deed of trust was a valid security, and does not afford ground for sustaining the attachment in this cause."

This instruction is assailed because it is said the alleged indorsement was inoperative to pass the title to the note, because the facts upon which the instruction is based show there was no delivery, without which there could be no valid indorsement, and, further, that it was not a valid gift, either *inter vivos,* or *causa mortis,* but if there was a valuable consideration for the note, the defendant owed it to the beneficiaries designated by the wife, and when the defendant recognized the trust and gave his deed of trust to secure the notes in execution of the trust, and if he executed it for the sole purpose of securing the notes, it was a valid security. The true objection to the instruction was its recognition of the notes as binding obligations based upon a valuable consideration, when in fact there was none; and they were wholly voluntary under the facts disclosed. This instruction was evidently given by the court as a natural sequence to instruction twelve, for defendant, in which the court instructed the jury that the deed from Benjamin Deyerle to defendant and his wife conveyed said Virginia lands to them and defendant had no power under the law to require his wife to sell or dispose of her interest therein, "and if the jury find from the evidence that the defendant and his wife, Ann E. Fry, by joint deed, dated *March* 2, 1874, sold and conveyed said lands to H. C. Chapman for $12,000, and the defendant on that day executed to his said wife for her interest in said proceeds the note for $6,000, then said note was a valid and binding obligation, and defendant thereby became her debtor in said sum of $6,000, and the $6,000 became the sole and separate property of said Ann E. Fry," and the renewal notes became the property of her children by her indorsement, and defendant had the legal right to secure them.

Now, the only deed executed by defendant and his first wife, Mrs. Ann E. Fry, *was dated February* 27, 1874. There was no deed in evidence dated March 2, 1874, and there was no substantial evidence that the deed was delivered March

2, 1874. The indistinct memory of James D. Deyerle certainly did not overcome the presumption that the deed was delivered the day of its date or acknowledgment, as he merely says, "To the best of my recollection the papers were all fixed the same day. *There may have been a few days difference."* Again he said, "I am not sure I was present at the time the money was paid over to Mr. Fry" (by Chapman, the purchaser). He was testifying to a transaction that had occurred twenty-four years previous to the date of giving his testimony. When asked, "If this deed was made on February 28, 1874, then the deed and note were made on different dates?" he answered, "Yes, sir, it seems to be so." Rocky Mount was the county seat, and twenty-eight miles from the place the deed was made and acknowledged, and the deed was recorded at Rocky Mount on the second day of March, 1874, and there was no railroad between those points at that time, and he had no recollection of any one going to Rocky Mount from his father's house on March 2, 1874.

Where the dates of the delivery of the note and the deed were of such vital importance as to their legal effect, the fact that the instruction tells the jury the deed was dated March 2, 1874, thereby conforming it to the date of the note, can not be considered a harmless misrecital. If the deed was in fact delivered February 27th or 28th, and the record of defendant's suit against Chapman shows that Chapman's notes to defendant were dated February 27, 1874, the date of the deed in evidence, then on that date defendant had reduced the money which was paid down and by taking the notes for the deferred payments in his own name, had also reduced the choses in action to his own possession, and all the proceeds of said sale had become his own property in his own right as owner by entirety and *jure mariti* of his wife's interest, and his subsequent execution of his note to his wife on March 2, 1874, was entirely gratuitous and without consideration.

The instruction was erroneous and misleading, both be-

cause it assumed an incorrect date to the deed, which was material, and also because it assumed, without qualification and without requiring proof that this note for $6,000 was predicated upon a prior or contemporaneous agreement as a condition of Mrs. Fry joining in the deed, it was a valid and binding obligation.

In our view of the law such an agreement as last mentioned was absolutely essential to its validity.

IV. As to the objection to the court's amendment of plaintiff's fourteenth instruction, we think when read in connection with defendant's thirteenth instruction, that amendment was proper. It was properly submitted to the jury to say whether defendant's failure to credit the notes of his children when the amounts which he had paid them and giving the deed of trust for their full face value and interest was with the fraudulent purpose of covering up his property with an indebtedness he did not owe. If this was an honest oversight, the deed of trust if valid for any purpose would have been valid to the extent of the amount he actually owed, if he only intended to secure what he actually owed them. [Bank v. Mercantile Co., 151 Mo. 149.]

As the other preferences were not assailed as fraudulent, it was proper to confine the instruction to the fraud or no fraud in the deed of trust securing the children of defendant.

On the other hand, the fact that he did owe the children some part of said debt so secured will not sustain the mortgage if it was fraudulent in fact as to a part. If fraudulent in part it is wholly so. [State ex rel. v. Hope, 102 Mo. 430-1.]

Where the deed of trust overstates the amount of the indebtedness which it purports to secure, in the absence of a satisfactory explanation it should be held fraudulent in toto.

We do not think this is a mortgage to secure future advances, which is necessarily indefinite. If valid at all, it secured what defendant already owed his children and it would seem that as he had a statement of his payments, there was

little excuse for omitting them in giving the deed of trust. Such a transaction should invite the closest examination.

The other instructions seem to be free from objection.

For the errors pointed out, the judgment in favor of defendant on the plea in abatement is reversed and the cause remanded for a new trial. *Sherwood, P. J.,* and *Burgess, J.,* concur.