FIRST NATIONAL BANK OF PLATTSBURG, Appellant, v. LOUIS S. FRY and EMANUEL S. FRY.

Division Two, January 4, 1909.

1. FRAUDULENT CONVEYANCE: To Pay Debt: Cash in Excess. If a creditor knows of his debtor's insolvency and takes a conveyance of land from him to himself worth more than enough to pay or to secure the debt, and pays cash or gives his notes to the debtor for the excess, the transaction is fraudulent in law as to other creditors, and the purchaser participates in the fraud. The necessary consequence of taking a conveyance of property whose value exceeds the debt, and of paying cash and executing a due bill to the debtor for the excess, is to delay and hinder the debtor's other creditors to that extent, and taints the whole transaction with fraud.

2. ———:———: ———: Excess To Be Applied To Other Debts. Where the creditor knew that the purpose of the conveyance to him was to defeat and hinder the debtor's other creditors, and aided the transaction, and took a conveyance to himself, to pay a past indebtedness, of property worth more than the debt, and paid the excess in cash and a note, with no agreement that the excess should be applied in payment of other specific debts, the conveyance will be set aside at the suit of the other creditors, whether or not, after the attachment was run, the excess was applied to the payment of other debts.

3. ———: ———: ———: ———: Subsequent to Attachment. It is immaterial whether the debtor, after an attachment of the conveyed property, used money paid to him by the creditor, to pay debts due other creditors. Whether the transaction was fraudulent, within the meaning of the law, must be determined by the facts existing when the transaction was consummated. Where it is evident that the purpose of the debtor, in receiving cash and notes in excess of the amount of the debt due the creditor, was not to use them to pay other creditors, and that the grantee of the conveyance knew that fact and aided the debtor in stripping himself of all his property, the conveyance will be set aside, notwithstanding, after the attachment was run on the property, the money and notes were in part applied to paying other debts.

4. ———: Equity: Deference to Trial Court. The appellate court is disposed to defer largely to the findings of the circuit court, but nevertheless in a case in equity it will assert its

right to review the whole evidence and draw its own conclusions therefrom. And where the evidence shows that a conveyance by one of the defendants to the other, his brother, was made with the intent to delay and defraud his other creditors, and that the brother participated in the fraudulent transaction, the decree of the circuit court dismissing plaintiff's bill to have the conveyance set aside, will be reversed.

Appeal from Buchanan Circuit Court.—*Hon. H. M. Ramey,* Judge.

REVERSED AND REMANDED (*with directions*).

*H. S. Herndon* and *Culver & Phillip* for appellant.

(1) Upon the facts the conveyance was fraudulent as a matter of law, regardless of the intention of the parties. Where a creditor, knowing his debtor to be insolvent, takes in payment of his debt property in excess of the amount due, and pays the difference to the debtor, either in cash or notes, the necessary effect of the transaction is to enable the debtor to withdraw the surplus from the reach of other creditors, and the transaction is fraudulent and void as to them. Deere Plow Co. v. Sullivan, 158 Mo. 449; Banks Milling Co. v. Bumes, 152 Mo. 373; Seegers Sons v. Thomas, 107 Mo. 635; Mapes v. Burnes, 72 Mo. App. 421; Simon v. Sincox, 75 Mo. App. 147; Willis v. Yates, 12 S. W. 232; Black v. Vaughan, 70 Tex. 47; Elser v. Graber, 6 S. W. 560; Henney Buggy Co. v. Ashenfelter, 82 N. W. 118; Wallis v. Adnoe, 13 S. W. 63; Oppenheimer v. Guckenheimer, 23 So. 9. (2) But the trial court declared the law to be that "the fact that the grantee bought more land than was necessary to pay his debt, and paid the surplus to the grantor, $300 in cash and $325 in a due bill, would not render the transaction or conveyance fraudulent in law, provided said $300 in cash and the proceeds of said due bill was paid to the grantor with the understanding that it should be appropriated to the creditors of the grantor and paid on

bona-fide debts of said grantor then due." In giving this declaration, and deciding the case on the rule therein promulgated, the court erred for these reasons: 1. There is no evidence that there was any "understanding" between the grantor and the grantee that the cash and note should be applied by the grantor to the payment of his other debts, and therefore the declaration of law is erroneous because it is not predicated upon any evidence in the record. 2. But even though the grantee expected and it was understood and agreed between him and the grantor that the latter should appropriate the cash and notes to the payment of other bona-fide debts, yet the fact remains that by delivering the cash and notes to the grantor, knowing he was insolvent, the grantee thereby placed in the hands of the grantor, freed from his own control or right to control, $625 of the purchase money, thereby enabling the grantor to place so much of his estate beyond the reach of his creditors, and its legal effect, whatever may have been the real intention of the parties, was to hinder and defraud other creditors. Willis v. Yates, 12 S. W. 232; Elser v. Graber, 6 S. W. 560; Oppenheimer v. Guckenheimer, 23 So. 9.

John A. Cross and James W. Boyd for respondents.

(1) An insolvent debtor is not deprived of the right to sell his property at full value for the honest purpose of paying his debts, though the purchaser, who buys in good faith, have knowledge of his insolvency; and this is true whether the entire consideration be paid in cash, or be paid in part by the cancellation of a debt from vendor to vendee, and the surplus in cash. Bump on Fraudulent Conveyances, pp. 62-3, 227-28; Wait on Fradulent Conveyances (2 Ed.), sec. 240; 14 Am. and Eng. Ency. Law (2 Ed.), 298, 521; Wood v. Shaw, 29 Ill. 444; Eastman v. McAlpin, 1 Ga. 157; Sutton v. Bana, 15 Colo. 98; Albertali v. Bran-

ham, 80 Cal. 631; Massie v. Engart, 32 Ark. 255; Levy
& Co. v. Williams, 79 Ala. 171; Hughes v. Monty, 24
Iowa 499; Ruhl v. Phillips, 48 N. Y. 125; Loeschigk v.
Bridge, 42 N. Y. 421; Troustine v. Lask, 4 Baxter 162;
Young v. Stollings, 5 B. Mon. 307; David v. McCarthy,
52 Kan. 116; Hobbs v. Davis, 50 Ga. 213; Priest v.
Brown, 100 Cal. 626; Gist v. Barrow, 42 Ark. 521;
Darland v. Rosencrans, 56 Iowa 122; Little v. Eddy,
14 Mo. 160; Dougherty v. Cooper, 77 Mo. 531; State
ex rel. v. Persel, 131 Mo. 318; Baker v. Harvey, 133
Mo. 661; St. Louis Coffin Co. v. Rubelmen, 15 Mo.
App. 287; Singer v. Goldenburg, 17 Mo. App. 566;
Mayberg v. Jacobs, 40 Mo. App. 136; Gens & Tiedet v.
Hargadline, 56 Mo. App. 250; Gro. Co. v. Ashton, 69
Mo. App. 463; State ex rel. v. Merrett, 70 Mo. 284;
Gage v. Meres, 107 Mo. App. 145; Gust v. Hoppe,
201 Mo. 293.   (2) An insolvent debtor cannot be de-
nied the right to dispose of his property, but the de-
sign in so doing, so far as he is concerned, must be
the application of the proceeds to the satisfaction of
his debts; and, if a creditor who purchases his prop-
erty and pays him the excess of the price, over and
above the debt, acts upon the reasonable expectation
that it will be so applied, or upon the understanding
or agreement that the debtor will so apply it, or the
debtor does so apply it, then the purchaser is not
chargeable with any participation in any secret in-
tent the debtor may have had.   The debtor cannot
have any fraudulent intent if it is his purpose to prop-
erly use the excess in paying his other creditors.   And
if a creditor has a reasonable expectation that the ex-
cess will be applied to the debtor's other indebtedness,
*a fortiori,* he cannot have any knowledge that the debtor
is acting with a fraudulent intent.   Sly v. Bell, 108
N. W. 227; Rankin v. Vandiver, 78 Ala. 562; Cotting-
ham v. Grocery Co., 30 So. 562; Grocery Co. v. Petty,
22 So. 505, 110 Ala. 260; Smith v. Kaufman, 14 So.
113; Fergerson v. Hall, 13 So. 302; Green v. Emens,

33 So. 540; Moogy v. Farley, 79 Ala. 253; Priest v. Brown, 100 Cal. 626; Hobbs v. Davis, 50 Ga. 213; Ruhl v. Phillips, 48 N. Y. 125; St. Louis Coffin Co. v. Rublemen, 15 Mo. App. 280. (3) In this State, facts and circumstances that would put a prudent man upon inquiry, and which would lead to a knowledge of fraud, if the inquiry were pursued, do not constitute knowledge of fraud, but are merely evidence to be submitted to the injury. Van Raalte v. Harrington, 101 Mo. 602; Deere Plow Co. v. Sullivan, 158 Mo. 440.

GANTT, P. J.—On June 25, 1898, the plaintiff commenced its action in the circuit court of Clinton county, against Emanuel S. Fry, to recover $4,746 on notes executed by the latter to the plaintiff. An attachment was sued out in aid of the principal suit, on the ground that said defendant had fraudulently conveyed his property with intent to defraud his creditors. Among other properties the attachment was levied upon a tract of fifty-five acres of land in Clinton county, specifically described in the bill in this case. On the first trial of the plea in abatement there was a verdict and judgment for defendant, from which an appeal was granted to this court and the judgment was reversed and the cause remanded. [First National Bank v. Fry, 168 Mo. 492.]

After the record was returned to the circuit court, a change of venue was granted to Buchanan county, and upon a trial anew before Judge A. M. Woodson a verdict was rendered sustaining the attachment and also for the debt and interest.

The fifty-five acres involved in this suit was sold under the judgment and at the sale plaintiff became the purchaser. On the day the attachment was levied and a few hours prior thereto the defendant Emanuel S. Fry conveyed the fifty-five acres to his brother, Louis Fry. After the purchase of this tract the plaintiff brought this suit in equity to set aside the deed

of Emanuel Fry to Louis Fry on the ground that said deed was fraudulent and void as to plaintiff. A change of venue was likewise taken in this suit to Buchanan county and the suit was tried before Judge Ramey, who dismissed plaintiff's bill, and from that decree plaintiff has again appealed to this court.

A full history of the debts and property of Emanuel S. Fry and of his disposition of his lands and personal property is set forth in First National Bank v. Fry, 168 Mo. 492, to which reference is made.

It is sufficient for the purpose of this appeal to state that for many years prior to June, 1898, Emanuel Fry owned about 700 acres of land in Clinton county, on which he resided. He was possessed, also, of some cattle, hogs, corn and farm implements, the whole aggregating about $30,000 in value. At that date he was hopelessly insolvent according to his own evidence, his indebtedness amounting to $60,000, $38,000 of which was due to his children, his wife and brother Louis Fry, his codefendant herein.

It appears that on June 22d and 23d, 1898, he employed Judge Sandusky to prepare conveyances of all his real estate, but his counsel was unable to attend to the matter until the 24th of June, 1898. On this last-named date he went to the residence of Emanuel Fry and spent the evening and next morning in preparing the conveyances of all the real estate. In the meantime defendant Emanuel disposed of all of his personal estate as follows: To his brother Abraham, he sold his cattle and corn on the 23d of June. Abraham testified: "He [Emanuel] came over to my house. He had twenty-four steers and he wanted to sell them. He said he was obliged to make some arrangements of his property; he was getting in bad shape, he couldn't borrow money." Thereupon Abraham bought the steers for $1,405 and the corn for $446. It appears that Emanuel had borrowed $1,300 from the Clay & Funkhouser Bank to buy these cattle, so

he requested his brother to give him two checks, one for $1,300 to pay Clay & Funkhouser and one for $105 which he wanted for "expenses." For the corn, Abraham gave Emanuel $96 in cash, and his note or due bill for $350. On the morning of June 24th or 25th, Abraham also bought three colts from Emanuel for which he paid him $90, because, as Abraham testified, "He [Emanuel] said he wanted to sell them, get everything out of the property he could."

On the morning of June 25, 1898, Emanuel sold his hogs to Samuel Thompson for $403, for which Thompson gave his check, which was cashed June 28th. It thus appears that on the morning on which the conveyances of his lands were made by Emanuel Fry, he had checks, cash and due bills in his pocket to the amount of $2,344, out of which he afterwards paid Clay & Funkhouser $1,300. Deeds were then on June 25, 1898, executed as follows: A warranty deed to the 55 acres in this suit to his brother Louis Fry, his co-defendant herein, for $3,025; a deed to Abraham Fry for 105 acres of land, which Abraham immediately conveyed to Mrs. Fry, the wife of Emanuel for the alleged consideration of a debt due her by her husband Emanuel of $5,691.22, incurred in 1883, upon which no payment of principal or interest had been made; a deed of trust to his three children conveying 320 acres of land (subject to a prior deed of trust of $7,500 to the Massachusetts Life Insurance Company) to secure an alleged indebtedness of $6,000, on which $2,400 interest had accrued, which said indebtedness accrued in 1874, and on which neither interest nor any part of the principal had ever been paid; a deed of trust to Luther Finch, trustee for his general creditors, of 190 acres of land to the amount of $19,000 and interest thereon. In addition to these land conveyances, he executed chattel mortgages, one to his daughter for $403 on five cows; one to Thomas and John Fry on

growing corn for $550; one to plaintiff bank on corn and hogs for $389.

The consideration for the fifty-five acres in suit was $3,025, and was paid by Louis Fry cancelling an alleged indebtedness of $2,400 and by giving Emanuel $300 in currency and a note or due bill for $325. The indebtedness to Louis Fry was represented by notes, some dated as far back as 1887, on which the interest was compounded at seven and eight per cent from dates, without any credits of either principal or interest. Louis had lived with his brother Emanuel for twelve or fifteen years, and no credit was given for board, though immediately after the deed to Louis he rented the land to Emanuel's wife for his board at $3 per week, and when the rent exceeded the board Louis gave the excess to Mrs. Fry. At the time defendant Louis paid Emanuel, his co-defendant, the $300 in cash and gave him his note or due bill for $325 over and above the amount Emanuel owed him for the fifty-five acres, the circuit court found "that the said Louis S. Fry knew that said Emanuel was in debt and financially embarrassed and that he, said Emanuel S. Fry, was conveying all his property to his creditors, but said Louis bought said fifty-five acres in good faith, paying full value for the same, for the purpose of collecting his debt and with no design to assist his brother, said Emanuel S. Fry, to hinder or defraud his creditors and without knowledge of any fraudulent purpose on the part of said Emanuel in deeding him said fifty-five acres of land." While the circuit court found that Louis Fry knew at the time he took the fifty-five acres in payment of his debt and paid $300 in cash and gave his note or due bill for $325 over and above the amount of his debt, "that Emanuel was in debt and financially embarrassed," Louis himself testified that on the 24th day of June, the day previous to his taking his deed for the fifty-five acres, "he had found out that Emanuel was terribly involved." Indeed, taking his whole evi-

dence into consideration, his presence in the family as a brother for twelve or fifteen years, his presence when the conveyances were being prepared by Judge Sandusky, his admissions as to his knowledge of these transactions and that his brother was terribly involved and was pressed for money, we think it is not open to doubt that he knew Emanuel was in an insolvent condition when he took his deed and paid him the excess of $625 over and above the amount of his indebtedness, in cash and in a due bill, and his rights must be determined upon the basis that he did know of Emanuel's insolvency at and before he took his deed and gave him the $300 and his due bill for $325 more. In fact, he paid him this money and gave him his said due bill at the very time when Emanuel was executing the other conveyances which stripped the latter of the title to every vestige of his property. There are also other pregnant circumstances tending to show his knowledge of Emanuel's intention to dispose of all this property. Mr. Herndon, the notary, who took the acknowledgments to the various deeds and conveyances, testified that defendant Louis Fry came to Plattsburg after him to go to the country to take the acknowledgments, representing that he had some work to be done at Plattsburg Springs about two miles south of Plattsburg and three or four miles from the residence of Emanuel Fry; and kept the witness in ignorance of his destination until they arrived at Emanuel's residence; that Louis took part in the consultations relating to the selection of the trustee. On July 5, 1898, after the attachment suit was commenced the deposition of Louis Fry was taken and he testified that he paid Emanuel the $300 in currency at the *latter's request*. He testified: "He [Emanuel] *wanted money* and I borrowed the money. He *wanted the currency.*"

Other facts will be stated if necessary in the course of the opinion.

I. From the foregoing statement of facts we have reached the conclusion that the agreed consideration for the conveyance of the fifty-five acres by Emanuel Fry to his brother Louis Fry, to-wit, $3,025, was about the actual worth and value of the land at that time, and that at the time of his purchase the defendant Louis Fry knew that his brother Emanuel Fry was insolvent, and that he had, by other conveyances made the same day, disposed of all of his other property and that Louis Fry paid for the said land by cancelling an indebtedness of $2,400, which he claimed his brother Emanuel owed him and by paying him in addition the sum of $300 in cash and executing to him a note or due bill for $325. Upon this state of facts the respective counsel for plaintiff and defendant reached entirely different views as to the law of the case. On the part of the plaintiff it is insisted that upon the foregoing state of facts the conveyance of this fifty-five acres of land was fraudulent and void as against the creditors of Emanuel Fry. Whereas it is insisted by counsel for the defendant that although the evidence showed that the court found that Louis Fry knew that his brother Emanuel was in embarrassed circumstances, he did not know the full extent of Emanuel's indebtedness until after all the conveyances were made on the 25th of June, 1898; that he had a perfect right to take the conveyance to the land in satisfaction of his debt and to pay Emanuel the $625 over and above the amount of his indebtedness, and the deed could only be held void upon proof that Louis Fry had notice of a fraudulent design on the part of Emanuel to defraud his creditors. And that as to the excess paid in money and the due bill Louis Fry is to be treated as a purchaser and before the transaction can be avoided as to him, it must appear from the evidence that he had notice of the fraudulent intent of his brother. And it is further insisted that Louis Fry had a reasonable expec-

tation that Emanuel would apply this $625 to the payment in part of his indebtedness to his wife and the interest upon the insurance mortgage and that he did so apply the said sum of $625 so paid him by Louis and therefore there was no fraud in the case.

It is the settled law in Missouri that a debtor has a clear and undisputed right to prefer one creditor to another and apply his property to the payment of one set of creditors to the exclusion of other creditors, and when this is done in payment of bona-fide debts the transaction will be upheld, although in doing so the act of the debtor had the effect and it was his intention to defer or hinder another creditor. [Sheeley v. Boothe, 73 Mo. 74; Forrester v. Moore, 77 Mo. 651.] On the other hand, it is equally well settled that if a creditor knows of his debtor's insolvency and takes more than reasonably enough to pay or secure his debt and pays cash for the excess, the transaction is fraudulent in law and the purchaser is a participant in the fraud. [McVeagh v. Baxter, 82 Mo. 518.] The distinction is drawn in a number of well considered cases in this State between the right of a creditor and a mere purchaser from an insolvent debtor. In Sexton v. Anderson, 95 Mo. l. c. 379, Judge BLACK, speaking for this court, stated the rule as follows: ''Generally, a sale of property with the intent on the part of the seller to thereby hinder, delay or defraud his creditors, and knowledge of such intent on the part of the purchaser, renders the sale void, though the purchaser pay a valuable consideration for the property, because the purchase of the property under such circumstances amounts to a participation in the intended fraud. [Dougherty v. Cooper, 77 Mo. 529; Frederick v. Allgaier, 88 Mo. 601.] But a debtor, though unable to pay all his creditors, may pay one or more to the exclusion of the others, either in money or the transfer of property; and the favored creditor or creditors may accept such preference. If the preferred creditor, in

such cases, acts in good faith and takes the money or property for the sole purpose of saving a bona-fide debt, mere knowledge that the debtor intended to hinder, delay or defraud his creditors does not render the transaction void as against the creditor taking the preference; for simple knowledge under such circumstances, it is held, does not amount to a participation in the intended fraud. [Shelley v. Boothe, 73 Mo. 74; Albert v. Besel, 88 Mo. 150.]''

That Louis Fry did not stop at taking simply enough property to liquidate the indebtedness of his brother Emanuel to him goes without saying in view of the evidence of Louis himself. His debt according to his own evidence only amounted to $2,400 and yet he took a deed to fifty-five acres upon the agreed price of $3,025, an excess of $625 worth of property. He testifies himself that he had arranged with Emanuel to take forty acres of the fifty-five at $55 per acre for his debt, and then at the instance of Emanuel agreed to take fifteen acres more and pay Emanuel $300 in cash and give him his due bill for $325, so that we think it is clear that as to this agreement to buy the fifty-five acres for $3,025, Louis Fry could not justify the transaction on the ground that he was a creditor simply taking property for the sole purpose of saving his debt, and will not be protected under the rule that a mere knowledge of the intent of his brother Emanuel to defraud or delay his other creditors would not make him (Louis) a participant in the fraud. In Kuykendall v. McDonald, 15 Mo. l. c. 420, Judge Scott, speaking for this court, said: ''The law will not suffer the creditor, although he may have a just demand against his debtor, to use that debt as a screen to protect the debtor's estate from his other creditors, when that estate much exceeds in value the amount of the debt. When a creditor, by fraud, will attempt to defeat the claims of other creditors, there is no hardship in postponing his demand, although a just one, to those which

he is endeavoring to defeat." And the same great
judge, in Potter v. McDowell, 31 Mo. 1. c. 74, said: ''A
purchaser may buy property from a debtor and pay
its value for it; yet, if the purchase is made with a
fraudulent intent to defeat a creditor's execution, the
sale will be void. But a debtor may prefer one credi-
tor to another, and may lawfully assign property suf-
ficient to satisfy the preferred debt. But, under pre-
tense of paying a debt, he is not permitted to assign
more property than is reasonably sufficient for that
purpose, to the prejudice of other creditors." Where
a creditor knowing his debtor to be insolvent takes in
payment of his debt property in excess of the amount
due and pays the difference to the debtor in cash or
notes, the necessary result of such a transaction is to
enable the debtor to withdraw the surplus from the
reach of other creditors. In Deere Plow Co. v. Sul-
livan, 158 Mo. 1. c. 449, it was said by this court: ''The
rule has been announced that if the creditor knows of
the debtor's insolvency and takes more than reason-
ably enough to pay or secure his debt . . . . the
transaction is fraudulent in law and the purchaser is
a participant in the fraud." [Henney Buggy Co. v.
Ashenfelter, 82 N. W. 118; McVeagh v. Baxter, 82
Mo. 518.] In Seger's Sons v. Thomas Bros., 107 Mo.
1. c. 642, this court adopted with approval the decision
of the Supreme Court of Texas in Elser v. Graber,
69 Tex. 222, in which that court said: ''It is the well-
settled law of this court that a creditor may lawfully
receive of his debtor a sufficient amount of his prop-
erty to pay his debt, though the latter be in failing
circumstances, and this be known to the creditor, and
although the necessary result is to hinder and delay
other creditors—provided he received no more than is
reasonably sufficient to satisfy his claim. The right
of the insolvent debtor to prefer his creditor makes an
exception and takes the case out of the operation of the
Statute of Frauds. This court has gone further, and

has held that such a transaction is not fraudulent, although the debtor has received more than enough property to pay his debt, provided by the terms of the sale he is bound to see that the excess of the purchase money over his own debt is to be applied to the payment of other preferred creditors, and does see that it is so applied. But the facts shown by the record before us make a very different case. Here Graber received property of value considerably in excess of the amount of his debt. He did not obligate himself to pay the excess to other preferred creditors, but executed his negotiable note therefor, payable on a long credit, to the vendor. By this transaction he placed that portion of the property not used to pay his own claim beyond the reach of the other creditors, and left the vendor free to deal with it as his own. The necessary consequence of this proceeding was to hinder and delay the other creditors as to this surplus, and the parties must be presumed to intend the direct result of their own willful conduct. The transaction is fraudulent in law; and appellee cannot be permitted to say that his intent was fair and that Danelly agreed to appropriate the note to the payment of his other creditors. The point has been repeatedly decided by this court. [Oppenheimer v. Halff, 4 S. W. 562; Seligson v. Brown, 61 Tex. 180.] The fraud of a part taints the whole transaction, and it must be set aside. [Lambeth v. McClinton, 65 Tex. 108.]' "

In Simon, Gregory & Co. v. Simcox, 75 Mo. App. 143, the interpleader bought from his debtor a stock of merchandise and in payment therefor he cancelled the indebtedness due of $3,349 and assumed the payment of other debts aggregating $1,200 and gave the debtor his negotiable promissory note for $1,100 due two years after date for the surplus. The debtor was insolvent and known to be insolvent by the interpleader at the time of the transaction, and the court refused an instruction which declared that: "If the court finds

from the evidence that the firm of Simcox & Stains on the 23rd of February, 1892, were in failing circumstances, and at that date they were indebted to Stover Simcox, and that they sold and transferred their entire stock of goods to said Stover Simcox, and that in part payment of said stock of goods said Stover Simcox executed to Frank Simcox a negotiable promissory note for eleven hundred dollars, which was not to become due until two years from the date thereof, then such sale is void as to the other creditors of Simcox & Stains, and your finding must be for the plaintiffs.'' The Court of Appeals said: ''It is in effect conceded that this instruction asserts a correct proposition of law, but if the concession be not made, in view of the authorities, it might as well be. . . . . The interpleader had the undoubted right to take firm assets to the amount actually due him on the notes of the defendants, provided he acted with good faith and with no fraudulent design. There was a conceded surplus of from $1,200 to $2,200 above what was necessary to discharge the notes of the defendants to the interpleader. This surplus the creditors of the firm had the right to have applied to the payment of their debts. The interpleader took the entire assets of the firm, giving his negotiable note to his son, payable two years after date, for a part of such surplus, equal to the amount of such note. The sale of the surplus on credit delayed the creditors for at least two years and put it in the power of the individual member of the firm receiving the note to dispose of such note to an innocent purchaser and thus effectually deprive the creditors of this amount of the surplus absolutely. The nature and probable effect of the transaction, under the circumstances, was to hinder and delay creditors of their lawful actions, and the parties thereto must be held to have intended that as the natural and probable result of their voluntary act. The instruction was a correct expression of the law.'' To the same effect is Black

v. Vaughan, 70 Tex. 47. It is insisted, however, with great earnestness by counsel for the defendant that the doctrine announced in the Texas cases .is unsound because they say it is settled doctrine of this court and many other courts of last resort that an insolvent debtor may lawfully sell his property for the honest purpose of paying his debts to a vendee having notice of such insolvency and the vendee is not required to see to the application of the proceeds to the payment of the debts. And if the entire consideration is. paid by the cancellation of the debt from the vendor to the vendee, then the purchaser is a creditor securing payment of his debts and he is not affected by knowledge of the fraudulent design on the part of the vendor, but must participate in the fraudulent design before he is affected. And that the later Texas cases seem not to adhere to the doctrine laid down in Elser v. Graber, 69 Tex. 222, citing Hadock Bros. v. Hill, 75 Tex. 193; Cross v. McKinley, 81 Tex. 332; Sanger Bros. v. Colbert, 84 Tex. 668. In regard to these cases it may be observed that in the decision in Hadock Bros. v. Hill, 75 Tex. 193, it was held that the mere purchase of property from an insolvent debtor and paying for it with a negotiable promissory note was not fraudulent as to creditors in the absence of notice of a fraudulent intent of the vendor; and Cross v. McKinley, 81 Tex. 332, decided by the commissioners, was based upon Hadock Bros. v. Hill, and these two decisions appear to us to be in conflict with the prior and later Texas cases on this subject, and certainly in conflict with Seger's Sons v. Thomas Brothers, 107 Mo. 642. In Sanger Bros. v. Colbert, 84 Tex. 668, the Supreme Court of Texas approved the following instruction given by the district or circuit court: "You are instructed in this case that Dyess, although in failing circumstances, had the right to prefer some of his creditors over others and to convey his property in satisfaction of such preferred creditors' claims. And Colbert and other pre-

ferred creditors had the right to receive such proper-
ty or its proceeds in payment of their debts, although
they or he knew that the intention and effect of the
conveyance was to hinder and delay other creditors
of Dyess. But in such case the purchase must have
been open and no more property must have been taken
by Colbert than was reasonably necessary to have paid
his debt and the other preferred creditor's claims; and
if at the time of the purchase no other preferred cred-
itors were mentioned, then Colbert had no right to pur-
chase more goods than were reasonably necessary to
pay his own claim, if he knew, or by the use of ordinary
diligence could have known, that Dyess was in failing
circumstances, although the excess over his debt was,
after the conveyance, paid to other creditors of Dyess."
It will be seen that this instruction embodies a state-
ment of the law of fraudulent conveyances well set-
tled in this State and in entire harmony with the cases
already cited in this opinion. In Proetzel v. Buck
Stove & Range Co., 26 S. W. 1110, the Court of Civil
Appeals of Texas held that where an insolvent debtor
sells to one of his creditors who had knowledge of the
extent of his indebtedness, all his property except what
is exempt from execution, and the purchaser pays the
price to the debtor without seeing that it is applied
to the payment of his debts, the sale is fraudulent as
to creditors, even though the debtor told the purchaser
that he would use the money to pay his debts and the
purchaser believed that he would do so. And in Arm-
strong v. Elliott, 49 S. W. 635 (1899), the Court of Civil
Appeals, following the Supreme Court of Texas in
Selingson v. Brown, 61 Tex. 180, and Elser v. Graber,
69 Tex. 222, held that where a grantor known to the
grantee to be insolvent conveys property which might
be subject to the payment of his debts and receives the
purchase price in money and notes which the grantee
delivers to the grantor to be applied in his discretion
and convenience the conveyance is void in fraud of

creditors. It has even been ruled in this State that an insolvent debtor may sell his property either to a creditor or to a stranger for the purpose of paying his debts, and if he does so for that purpose and the proceeds are applied to the payment of his debts, the sale is valid if fairly made. But as we have already seen if an insolvent debtor makes a sale of his property not for the purpose of paying his debts but in order to turn his seizable property into cash or notes that may be easily withdrawn from the reach of his creditors, then he is guilty of a fraud and if his vendee has knowledge of such purpose, the sale is fraudulent. In the instant case, we think there was ample evidence that Emanuel Fry intended to withdraw a portion of the money realized by him from the sale of his property from the reach of his creditors. After having employed counsel to draw conveyances which would dispose of every foot of his real property or so incumber it that there would be no equity left, he proceeded to sell all of his personal property; can it be said he did this to pay debts? When he sold his steers to his brother Abraham he said "he was obliged to make some arrangement of his property; he was getting in bad shape, he could not borrow money." The cattle amounted to $1,405, he owed Clay & Funkhouser $1,300 of this for the purchase price of the cattle and he requested his brother to give him two checks, one for the $1,300 to pay for the cattle, and another for $105, which he said he wanted "for expenses." He also sold to this brother three colts, "because he wanted to get everything out of the property he could." On the 23rd and 24th days of June, 1898, he disposed of all of his personal property, from which he realized $2,344, none of which was deposited in any bank, but according to his own statement was kept by him at his home or in his pocket. But it is insisted by counsel for defendant Louis Fry that he paid his brother Emanuel the excess of $625 over and above the amount which Emanuel owed him

upon the reasonable expectation that Emanuel would apply this excess to the payment of $300 which he owed his wife and $450 interest on the mortgage to the Insurance Company. And Emanuel testified that he sold the land in controversy for the $625 and the cancellation of his debt to Louis, so as to get the money to pay these two debts. In transactions between parties bearing a close personal relation to each other, such as parent and child, husband and wife, brothers, or attorney and client, the courts of equity apply the most rigid scrutiny when there is a charge of fraud. While Emanuel Fry and his brother Louis testified that Emanuel induced Louis to buy the additional fifteen acres and pay him $625 therefor over and above the amount which Emanuel owed Louis, on the ground that he must have more money so as to be enabled to pay his wife the $300 which he claimed he owed her, and $450 to pay the interest on his mortgage, it appears from the testimony that he had already, on the 23d and 24th days of June, disposed of his personal property from which he realized $2,344. It thus appears that over and above the $1,300 which he owed Clay & Funkhouser on the purchase price of the cattle, he had in money and checks and due bills over a thousand dollars in his possession, with which he could have paid both his wife and the Insurance Company. Moreover, the deposition of Emanuel Fry was taken on July 5, 1898, after the attachment had been served. In that deposition, referring to the fact that he owed his brother Louis Fry $2,400 in notes, he was asked: "Q. How did you pay these notes? Ans. I paid fifty-five acres of land. Q. Was that paid for? Ans. No, sir, lacked $625; he paid me in money. Q. He paid you in money? Ans. Yes, sir. Q. What did you do with it? Ans. I have it. Q. Got it where? Ans. Except what I have paid out. Q. Where have you got it? Ans. At home. Q. How much have you got at home? Ans. I think it is $500 on hand." But it is now claim-

.ed that on June 25, 1898, seven days before he gave
that deposition, he had paid his wife $300, and on July
1, 1898, four days before the taking of his deposition,
he had paid $450 to the Insurance Company. While
both Abraham and Emanuel Fry testified in this case
that the $300 in currency which the latter received from
Louis on June 25th was immediately paid to Mrs. Fry,
and Emanuel further testified that on the second of
July, after the writ of attachment had been sued out,
he cashed the note for $325 given him by Louis and the
note for $350 given by Abraham and out of the pro-
ceeds paid $450 interest on the debt to the Insurance
Company and sent $200 to his daughter to pay her
expenses, this testimony is utterly at variance with his
deposition taken on July 5, 1898, in which he stated that
he had $500 of the $625 received from Louis in his
pocket. In that deposition he also testified that Louis
paid him the $625 in money, but all the testimony shows
that $325 of it was in a due bill, which was canceled
later on, Louis giving his note directly to Mr. Trim-
ble, the brother-in-law of Emanuel, and was not in
money, so that before paying out the $450 interest
money on July 2nd, Emanuel Fry had $2,969 on his
person in cash, checks or notes or due bills. If he paid
his wife $300 in currency on the 25th of June, 1898, he
only had $2,669 in his house, but if as he said he still
had $500 of the $625 paid him by Louis on the land
in suit, on the 5th of July, then he could not have paid
his wife the $300 on June 25th, because he stated on
July 5th that he had $500 of it on hand. That Eman-
uel Fry paid the $450 interest to the Insurance Com-
pany on the 2nd of July, 1898, out of the monies he had
on hand, there seems to be no doubt whatever. But
when his own evidence is all taken together we think
it is impossible for any court to find as a fact that he
paid his $450 out of the particular $625 he received
from his brother Louis, inasmuch as he had at the
same time in one common fund the moneys he had

realized from the sale of his personal property and the due bills and checks therefor amounting to at least $2,669. It further appears from Emanuel's testimony that he sent $200 of these moneys to his daughter for expenses. In view of all this testimony as to the conduct of Emanuel Fry, we think there can be no reasonable doubt of his intent to hinder, delay and defraud his creditors. It was so found in the attachment case, and the attachment sustained on that ground, and the circuit court in this case found affirmatively that Emanuel Fry kept "about $500 so that it could not be reached by his creditors." In view of all of this testimony, it ought not certainly to be contended that Emanuel Fry made these conveyances and disposition of his property in good faith and without intent to hinder, delay and defraud his creditors. Outside of the fact that Louis Fry took more property than was reasonably necessary to secure his alleged debt and paid over to Emanuel $625, whereby Emanuel was enabled to place the same out of reach of his other creditors, we think there was ample evidence to show that Louis knew of this fraudulent intention on the part of Emanuel. It must be remembered, we think, that they were brothers and had lived in the same house for twelve or fifteen years. Louis not only knew his brother was insolvent, but on the two days preceding the conveyance to him of this fifty-five acres of land, he was present when Emanuel sold his personal property and helped weigh up the stock and knew that his brother had been paid for it. He was present in the house when the conveyances of all the other real estate were made; he took part in the consultation in regard to the trustees; he went to Plattsburg after the notary to take acknowledgments to the deeds and in order to keep the notary in ignorance of his destination, told him that he wanted him to accompany him to Plattsburg Springs to take the acknowledgment of a chattel mortgage, he, Louis, was taking. Before he paid over

the $300 in cash and gave his due bill for the $325 and took his conveyance to the fifty-five acres, he knew that his brother Emanuel was conveying the homestead of 105 acres to his wife and was placing a mortgage of over $30,000 to his three children on 320 acres of land, though he had never heard of such indebtedness to the children in his life. In 20 Cyc. 487, it is said that "notice will not be implied merely from intimacy or relationship between the parties to the alleged fraudulent transfer, although notice of the financial condition of the transferrer and of his intent to defraud is sometimes implied from the relationship of the parties in connection with other circumstances, as where they are parent and child, husband and wife, brothers, or attorney and client." In view of all the circumstances, we think there was ample evidence to show knowledge on the part of Louis Fry of the fraudulent purpose of Emanuel Fry to hinder, delay and defraud his creditors, and that this knowledge came to him before he paid the $300 in cash and gave his due bill for the $325. As to the claim that he paid him this money for the purpose of paying his debts, it is not pretended that Emanuel had any other debt that he desired to pay out of this money except the $450 interest and the $300 claimed to be due his wife, and yet Louis Fry, knowing of the sale of the cattle and the horses and the hogs, knew that Emanuel had more than enough money to pay these two debts, and it could not be true that he sold any portion of this land to Louis for the purpose of paying these two particular debts. There is certainly no evidence in our opinion that Louis stipulated that this $625 should be used to pay his wife's debt, or the interest due the Insurance Company, or that Emanuel agreed that he would so apply it. All that Emanuel said was that he had some debts he had to pay, naming the interest money and notes to his wife.

Moreover, Emanuel Fry did not pay the insurance interest until after the attachment had been served in this case. At that time the $325 note or due bill had not been applied to the payment of any debt, for Emanuel still had that due bill in his possession. In Willis v. Yates, 12 S. W. 232, it was said: "Whether the transaction was, within the meaning of the law, fraudulent, must be determined by the facts existing when the transaction was consummated, and it is immaterial whether the debtor subsequently used the money paid to him by the purchaser in the payment of debts due to other creditors." The subsequent transaction between Emanuel and his brother-in-law, Mr. Trimble, by which these two due bills of Louis and Abraham were taken up and new notes executed by Abraham and Louis directly to Mr. Trimble in order to procure the cash for them discloses that it was the intention of Emanuel to place these two due bills out of danger from a garnishment proceeding against his brothers to subject the amount thereof to his debts. Louis readily acceded to this proposition when told that Mr. Trimble desired the notes in that shape so that he would not be mixed up in the litigation. While this court is disposed to defer in a large measure to the findings of the circuit court, it has often been ruled that in a case in equity this court will assert its right to review the whole evidence and draw its own conclusions therefrom. After a careful consideration of all the evidence, we are of the opinion that the conveyance of this fifty-five acres of land by Emanuel Fry to his brother Louis Fry was made with the intent to delay and defraud the creditors of Emanuel Fry, and that Louis Fry had knowledge of that intent and must be held to have been a participant in the transaction, and therefore the decree of the circuit court in dismissing the bill of the plaintiff was erroneous and must be reversed, and it is accordingly adjudged that the said decree of the circuit court be set aside and the cause

remanded to the circuit court with directions to enter a decree vesting the title to the said fifty-five acres in the plaintiff by virtue of its sheriff's deed thereto under the judgment.

*Fox* and *Burgess, JJ.,* concur.