FIRST NATIONAL BANK OF PLATTSBURG v.
BESSIE M. RENICK et al., Appellants.

**Division Two, December 10, 1912.**

1. **APPEAL: Finding of Chancellor: Evidence.** The evidence in this suit to set aside a deed of trust is *held* sufficient to support the chancellor's finding that the note upon which the deed of trust was based was without consideration.

2. ———: ———: ———: **Credibility of Witnesses: Altered Testimony.** The trial court is *held* to have been justified in refusing to credit witnesses who had apparently altered their testimony to conform to a prior decision by this court of the point in issue.

Appeal from Lafayette Circuit Court.—*Hon. Samuel Davis*, Judge.

AFFIRMED.

*John A. Cross* and *James W. Boyd* for appellants.

*H. S. Herndon* and *Culver, Phillip & Spencer* for respondent.

BLAIR, C.—This is a suit to set aside a deed of trust executed June 25, 1898, by Emanuel S. Fry to his three children to secure notes amounting, with interest, to about $30,000. On the same day the deed of trust was executed Fry conveyed all his other property and the present plaintiff instituted an action against him, attaching the 220 acres of land covered by the deed now assailed. In that action there was judgment for defendant on the plea in abatement and for plaintiff on the merits. On plaintiff's appeal the judgment on the plea in abatement was reversed and the cause remanded and on retrial the attachment was sustained.

The land now involved was bought by plaintiff at execution sale under the judgment. The opinion of this court in that case (168 Mo. 492) states the facts as then proved, and it was there held the trial court might well have directed a verdict sustaining the attachment. On the trial of this case the principal evidence for defendants was given by the same witnesses who testified for defendant Fry in the attachment proceedings.

The action of this court in reversing the judgment and remanding the former case was in part predicated upon the conclusion that there was no evidence in the record (168 Mo. l. c. 514) tending to show there was any consideration for the notes secured by the deed of trust now sought to be set aside. The record disclosed that the notes mentioned depended for their consideration upon a note for $6000 executed in 1874 by Emanuel S. Fry to his then wife, for one half the sale price of Virginia lands given the wife by her father. In that case it appeared the note was executed without any previous agreement respecting it after the husband had reduced the proceeds of the lands to his possession. The evidence in the former case chiefly consisted of depositions and these were offered in the present case in proof of the character of the testimony of the principal witnesses in the former case, they being also the principal witnesses in this case. As to what the character of that testimony was in the attachment proceedings, reference, for the sake of brevity, is made to the decision of this court in the attachment proceedings. In that case, on retrial, the circuit court directed a verdict sustaining the attachment and no appeal seems to have been taken. It also appeared in evidence in the present case that in other cases instituted by other creditors of Fry the depositions of some of the witnesses had been taken and that in no instance, prior to the institution of the present suit, had the testimony as to the facts indicating a want

of consideration for the original $6000 differed materially from that in the attachment proceedings first mentioned.

The evidence now discloses that some of the witnesses have a recollection of the circumstances under which the $6000 note was executed and delivered entirely different from that they had when their testimony was previously taken. Under these circumstances the trial court refused to believe them and found for plaintiff and defendants appealed.

In First National Bank of Plattsburg v. Fry, 168 Mo. l. c. 513, it was said of the very transaction involved in this case that "When the rights of creditors are involved, transactions like this between husband and wife are to be scrutinized with the most jealous care." It was further pointed out that the presumption was that the deed from Deyerle and wife to Mrs. Fry and that from Fry and wife to Chapman were acknowledged February 28, 1874, and that the presumption was these deeds were delivered on the day they were acknowledged and, therefore, two days before the execution of the note from Emanuel S. Fry to his wife which bore date March 2, 1874. Since defendants' position is that the trial court was wrong in finding from the evidence that the $6000 note was without consideration, it becomes necessary to examine the evidence in this record.

That the character of the evidence before the trial court may be understood, excerpts therefrom may prove enlightening. J. D. Deyerle, one of defendants' principal witnesses, had testified in 1898 that the deed to Fry and wife from Deyerle and the deed from Fry and wife to Chapman were both acknowledged on the same day and delivered on the day they were acknowledged. In 1907 he testified that the deeds were not delivered until two or three days after they were acknowledged. During his cross-examination the following occurred:

"Q. You say to-day, nine years later, that you were mistaken when you made these answers to these questions, and you also say that you can give no reason for saying why your memory to-day is better than it was nine years ago; is that right?  A. Only by my recollection, sir.

"Q. Now, the fact in the matter was this, Mr. Deyerle; you gave your testimony in 1898, and you know this case was tried after that, don't you?  A. Yes, sir; I heard it.

"Q. You know from Mr. Fry that it was tried? A. Yes, sir.

"Q. Mr. Fry told you that the case went to the Supreme Court of Missouri, didn't he?  A. Yes, sir.

"Q. And he told you that the Supreme Court of Missouri had reversed the decision, didn't he?  A. Yes, sir.

"Q. And Mr. Fry told you that the Supreme Court in reversing that decision had held that there was no consideration for the note that was given by him to his wife—the $6000 note, referred to in your testimony, unless it could be shown that an agreement existed between him and his wife before the note was executed that the note was to be given in consideration of her deeding this land to Mr. Chapman, joining in the deed to Mr. Chapman; he told you that, didn't he?  In substance?  A. I don't exactly know the circumstances, something to that effect.

"Q. And he told you it was necessary to get evidence to that end, didn't he?

"Objected to by counsel for defendants, because the defendants are not bound by any conversation he had with E. S. Fry.

"Q. He told you that it was necessary to get evidence to that effect, to show that this agreement existed between him and his wife before the deeds were executed, didn't he—in substance—sir?  A. No. sir.

"Q. He didn't tell you that?  A. No, sir.

"Q. Then they took your deposition over, didn't they? A. Next time they came.

"Q. That is the time that Mr. Fry came here and told you about what the Supreme Court had decided? A. Yes, sir.

"Q. When it became necessary to take your deposition over the second time, the Supreme Court had decided the case, hadn't it—sir? (Objected to as hearsay testimony.) A. I don't know.

"Q. You know it from what Mr. Fry told you? A. That they had reversed the case back?

"Q. And he told you the facts you said he told you? A. Yes, sir.

"Q. And then your deposition was taken the second time? A. Yes, sir.

"Q. And then when they took your deposition over the second time, you changed your testimony from what it had been on the first trial? A. Yes, sir."

With reference to the same matter, the delivery of the deeds, etc., the same witness further testified:

"Q. Didn't you say to me on cross-examination that Mr. Fry had explained to you that the Supreme Court of Missouri had reversed the judgment in the case of Bank v. Fry, and explained to you why they had reversed it? Did you not make that admission yourself on your cross-examination? A. Yes, sir, I believe I did.

"Q. That is true, isn't it? A. Yes, sir.

"Q. Now, I say that it was after the time that Mr. Fry had explained to you the decision, that you first made the statement that the two deeds we have been talking about were not delivered until three days after they were acknowledged? A. Yes, sir.

"Q. You had never made any such statement as that before? A. No, sir.

"Q. At that time you made the statement that they were delivered on the same day they were ac-

knowledged, and you now say you were mistaken when you made that statement? A. Yes, sir.

"Q. When did your father make the deed to you for your share of this land? A. I have forgot that date, now, sir.

"Q. About what time? A. The Franklin county land, you mean that division?

"Q. Yes. A. I think, sir, about six months after.

"Q. That is your recollection now, that it was six months after? A. Yes, sir.

"Q. Don't you know it was two years after? A. No, sir.

"Q. Didn't you state in your deposition it was the 2nd day of November, 1876? A. My deed?

"Q. Yes. A. I don't remember, sir.

"Q. You do not remember whether that was correct or not? A. Made the deed to me?

"Q. Yes, sir, you don't remember if that is correct or not? A. No, sir.

"Q. Why can't you remember a transaction of that kind, which was a business transaction, in which you were interested, but you can remember the statement made by your sister to your brother-in-law thirty-three years ago, a transaction in which you were not particularly interested? A. I cannot say, only from my memory.

"Q. There was nothing particular to impress this transaction on your mind, was there? A. No, sir.

"Q. Now what did your father say to you when he made the deed to you of your portion of the land? A. Just made me the deed, turned it over to me.

"Q. Don't you recall what he said to you at the time? A. No, sir.

"Q. And were you present when he made the deed to your sister, Mrs. Chapman, for her portion of the land? A. Yes, sir.

"Q. Do you remember what he said to her at that time? A. No, sir, I can't remember, sir.

"Q. The deed to Mrs. Chapman for her portion of the land and the deed to you for your portion of the land was made after the deed was made to Mrs. Fry, for her portion of it? A. Yes, sir, it was.

"Q. Yet you don't recall what occurred when these deeds were made? A. Not exactly.

"Q. Yet you were personally interested in this matter? A. Yes, as far as my own deed.

"Q. You cannot recall those things, and you do recall the conversation between your sister and her husband when the deed was made to her? A. Yes, sir.

"Q. What else occurred on that day, besides these transactions? A. You mean when the deed was made?

"Q. When the deeds were delivered and your sister remarked to her husband, 'Where is the note?' and her husband turned to you and asked if you could get him a blank note, etc., what other conversation occurred there on that day? A. I cannot recall, sir.

"Q. You don't recall anything else that occurred on that day? A. No, sir."

Henry S. Deyerle's deposition had been twice previously taken and in neither instance had he testified to any conversation between Fry and his wife indicating a previous agreement between them that Fry was to give his note to her in consideration of his receipt of the purchase money and notes for the Virginia lands. In this case he testified to such a conversation but was unable to explain why he remembered it thirty-three and one-half years after the transaction when he failed to remember it on the occasions when his deposition was taken six and ten years before his testimony in the present case was given.

The substance of the testimony of Henry S. Trout, so far as it was competent and admissible, was

that on February 27, 1874, the day the deeds were drawn, he heard Mrs. Fry direct the conveyancer to make the notes or bonds Chapman was to give for the deferred payments payable to Emanuel S. Fry; saying she "had an understanding and agreement with him which was satisfactory to her as to the amount of the purchase money." According to Trout this was Mrs. Fry's language and he claimed to have a distinct recollection of it. His testimony was given thirty-three years after the alleged occurrence and followed a conversation with E. S. Fry in regard to the matter. The witness remembered scarcely anything else which occurred at or near the date of the drafting of the deed. He was unable to remember the date of Mrs. Fry's marriage, though assigning his cousinly interest in her affairs as the reason the conversation to which he testified was impressed upon his memory. He was sixty-five years of age when his testimony was taken.

C. W. Chapman, testifying thirty-three years after the fact, claimed to remember seeing his grandfather, Benjamin Deyerle, hand to Mrs. Fry something at some time during the spring of 1874 and say to her that they were the papers to the Franklin county land. He did not remember that Mrs. Fry said anything at all on that occasion though it was at that time, according to J. D. Deyerle, Mrs. Fry asked for and received the $6000 note from her husband.

Emanuel S. Fry's deposition had been taken several times before the trial in this case. In his deposition taken in 1898, twenty-four years after the event, he testified concerning the happenings at the time of the allotment of the Virginia lands by his wife's father thus:

"A. The land was all together and it would have to be divided, about forty or forty-five hundred acres of land, into four different lots between four different

children, each one was to have one-fourth of the land, of course, I was to have my wife's as she was one of the children. After talking awhile Mr. Chapman remarked, says I will give you $12,000 for your part, my part of the land. I told him I didn't know anything about the price of land in that country and Mr. Deyerle was sitting there in his seat. Of course, I didn't live out there and didn't know the worth of land there. I just remarked to him I would leave it to Mr. Deyerle, knowing that I didn't know anything about what that land might be worth, property like that, whether I should take it or not, take the $12,000 or not; the old gentleman said, he just remarked, 'Fry, I believe that is a good price.' I told him all right. Mr. Deyerle gave his decision, he said all right, he would give it. I thought it was right, what they said and they was to write out the deed; old Mr. Deyerle, young David Deyerle was there.''

In his testimony in this case he details an alleged conversation in which he, his wife and his wife's father participated; in which the wife took the part he had assigned himself in his previous testimony and in which she also stated that he, Fry, had agreed to give her his note for $6000 for one-half the purchase price of the land. Trout, who was present, remembers the conversation quite differently.

Fry had previously testified also, when asked, "Then why did you give her (his wife) your note," as follows:

"A. Because I thought it was right. Mr. Deyerle deeded it to both of us. He remarked 'Had we better draw this deed to you?' she said 'No, let Mr. Fry have half of it.' I had the deed recorded, wrote up and I gave her my note for half of it."

In this case he details a conversation at the time of the delivery of the deeds in which he makes it appear that the reason for his executing the $6000 note was the alleged agreement at the time of the division

of the land, a conversation which it appears he had not recalled until after this court handed down its opinion in the attachment proceedings.

The significance of the changes in the testimony of Fry and the Deyerles is considerable when it is recalled that they were made after this court had held the $6000 note without consideration because of its delivery, without previous agreement, after Fry's reduction to possession of the purchase money and notes given by Chapman for the land and after Fry had advised these witnesses of the decision and of its purport.

In addition, neither Fry nor his children had ever treated the notes to the latter as an existing liability. He was made their guardian and curator about 1885, regularly settled his accounts as such, and as they became of age took from each of them a receipt in full of all sums in his hands due from him to them and at no time during the pendency of this guardianship did he charge himself with the notes alleged to have been successively executed to them in renewal of the $6000 note, though regularly making the usual affidavit to the effect that in his settlements he had charged himself with all moneys and property in his possession belonging to them. Further, Fry kept accounts against his children for sums advanced to or for them, charging them with a total of about $4000 but crediting none of these charges on the notes to them. Had these credits been entered as of the dates they were charged in the account kept by Fry, the notes secured by the deed of trust here in question would have been most materially reduced. Again, the attitude of the children after the deed of trust was executed and recorded but ill consisted with the idea that they regarded the notes as valid and justly enforceable obligations. The land has been rented mainly to Mrs. Emanuel S. Fry (a second wife) and the proceeds and more, in excess of taxes and interest on the prior

mortgage, have been expended in Fry's litigation with his creditors though this is the first case in which the alleged interests of Fry's children have been directly assailed.

In view of the rule heretofore mentioned and the character of the evidence in this case, as indicated above, the finding of the chancellor on the evidence to the effect that the $6000 note was executed without consideration ought not be overturned. The lapse of time, the discrepancy between the testimony formerly given and that given at a later period, the fact that the changes made so exactly conformed to the needs of appellants as pointed out by this court in its former decision, the fact that Emanuel S. Fry, who is the most active personage in all this litigation, reported the reversal to the Virginia witnesses and explained to some, at least, of them exactly what was needed to meet the decision and that then he and these witnesses again gave their testimony with the very substantial changes necessary to support appellants' contention in this case—all these things are to be borne in mind when examining the accuracy of the trial court's conclusion as to the facts. [Moore on Facts, secs. 893, 1059.]

The judgment should be and is affirmed. *Roy, C.,* concurs.

PER CURIAM.—The foregoing opinion of BLAIR, C., is adopted as the opinion of the court. All the judges concur.